## STATE v. FRANK F. HOFACRE.[1]

October 27, 1939.

No. 32,183.

[1]Reported in 288 N. W. 13.

*Stevens & Stevens*, for defendant.

*J. A. A. Burnquist*, Attorney General, *M. Tedd Evans*, Assistant Attorney General, *Ed J. Goff*, County Attorney, and *William G. Compton*, First Assistant County Attorney, for the State.

*Leonard, Street & Deinard*, amici curiae, filed a brief in support of the contention of the State.

*Kingman, Cross, Morley, Cant & Taylor*, amici curiae, filed a brief in support of the contention of defendant.

JULIUS J. OLSON, JUSTICE.

On October 11, 1938, the grand jury of Hennepin county returned an indictment against defendant accusing him—

"of the crime of SELLING UNREGISTERED SECURITIES committed as follows:

"The said Frank F. Hofacre on or about the 26th day of January, A. D. 1937, at the City of Minneapolis in said Hennepin County, Minnesota, then and there being, wrongfully and unlawfully did, acting as an agent of S. W. Gongoll & Company, sell to one Pauline Dressler, a security, commonly called a 'Capital and Income Management Agreement' in S. W. Gongoll & Com-

pany, a more particular description of said security being to the Grand Jury unknown, said security then and there not being registered for sale in the State of Minnesota by the commission having supervision and control of the Department of Commerce of the State of Minnesota, as required by Chapter 21-B, Mason's Minnesota Statutes, 1927, as amended, said sale to the said Pauline Dressler being then and there made by the said Frank F. Hofacre, in the course of repeated and successive sales of like securities as aforesaid, in the course of which said repeated and successive sales the said Frank F. Hofacre, on or about the 1st day of June, 1937, in the State of Minnesota, did sell like securities as aforesaid to one Hazel A. Mitchell, and on or about the 3rd day of June, 1937, did sell like securities as aforesaid to one Mary Alsterberger, and to sundry and divers other persons whose names are to the Grand Jury unknown; contrary to the statute," etc.

In conformity with his demand and pursuant to an order of the court, the state furnished a bill of particulars, from which it appears that defendant "from the year 1932 up to and including the month of January, 1938," was an employe of S. W. Gongoll, who was doing business as S. W. Gongoll & Company and maintaining a suite of offices in the Foshay Tower in Minneapolis. Defendant during this period "negotiated with prospective customers relative to the depositing with" Gongoll certain moneys under the terms of what was known as a "Joint Fund Agreement." A copy of the agreement was attached as exhibit "A" and made a part of the bill of particulars so furnished. In addition to receiving a stated salary, defendant also received "a certain percentage computed upon the amounts deposited" by investors under the agreement, each of "the investors" receiving one copy thereof and Gongoll retaining the other. Defendant was not an officer of Gongoll and had nothing to do with the investments of funds so deposited. Gongoll became insolvent. At the time of his failure there were some 3,600 accounts on his books relating to deposits made by the complaining witness and other persons similar-

ly circumstanced with whom Gongoll had dealt. As the agreement, exhibit "A," is the foundation for the prosecution and defendant's attack upon the sufficiency of the indictment, a copy thereof is found in the margin.[2]

Defendant demurred to the indictment on the ground that it did not state facts sufficient to constitute a public offense. The court overruled the demurrer but upon defendant's request certified, pursuant to 2 Mason Minn. St. 1927, § 10756, four questions of law for determination. These are:

---

[2]Exhibit "A"

"Joint Fund Agreement

"Name—Mr. Donald L. Dressler &/or Mrs. Anna M. Dressler as joint tenants with the right of survivorship and not as tenants in common.

"Address—2715 Girard Avenue North, Minneapolis, Minnesota (hereinafter called the 'First Party'), and S. W. Gongoll, of Minneapolis, Minnesota, (hereinafter called the 'Second Party'), desiring to join funds on a partnership basis under the conditions herein set forth, agree as follows:

"1. The Joint Fund hereby established shall be $144.10, consisting of $131.00 furnished by First Party, and $13.10 furnished by Second Party. The amount furnished by First Party shall be made up of cash and/or proceeds from the sale of securities and/or collateral credit, and the amount furnished by Second Party shall consist of cash and/or collateral credit equal to ten per cent (10%) of the amount furnished by First Party. The respective interest of the parties hereto in such Joint Fund shall be in proportion to the capital furnished by them except as hereinafter provided.

"2. The Joint Fund shall be in charge of Second Party and shall be deposited by him, in his name, with a member or members of one or more of the legally recognized and established security and/or commodity exchanges or markets in the United States or Canada, and shall be used to buy, sell, exchange, transfer, and trade, in any stocks, bonds, debentures, notes, warrants, or commodities listed or authorized to be traded in on such exchanges, when and in such manner as Second Party shall deem advisable and for the best interests of both parties, and all in conformity with the rules, regulations, and customs of such exchanges and markets.

"3. Subject to other provisions of this Agreement, either party may arrange for the sale or withdrawal of securities furnished by him to establish collateral credit as part of the Joint Fund, providing the amount

"1. Do the facts as stated in said indictment and read in connection with said Bill of Particulars, constitute a public offense?

"2. Does State's Exhibit 'A' attached to the Bill of Particulars, filed by the State, constitute a security as defined by the laws of the State of Minnesota?

"3. Do the facts, as set forth in said Bill of Particulars, and read in connection with said Indictment, constitute a sale by the defendant of a security as defined by the laws of the State of Minnesota?

"4. Did any of the facts as set forth in said Bill of Particulars justify in law the defendant in selling said security, if the Court

of such collateral credit is replaced with an equal amount of cash and/or other collateral credit. The value of securities furnished by either party, in excess of the amount of collateral credit included as a portion of either party's share in this Joint Fund, shall be considered the property of the party furnishing such securities. Interest on collateral credit shall be charged against the portion of the Joint Fund belonging to the party furnishing the securities on which such collateral credit is based.

"4. Interest and/or dividends paid by issuing companies on securities used to provide collateral credit as part of the Joint Fund shall not be considered as income or profit to the Joint Fund, but as income belonging to the party furnishing such securities, and shall be added to and included with the first distribution of profits from the Joint Fund or with the first quarterly statement issued after their receipt; or, on request, they will be paid to First Party at any time after they are available.

"5. At the end of each quarterly period, the amount by which the Joint Fund or the market value of securities and/or commodities purchased or optioned exceeds the sum of the capital furnished by the parties hereto shall be considered net profits and shall be divided equally between them.

"6. Distribution of profits may be made at any time when they equal or exceed ten per cent (10%) of the principal furnished by parties hereto, or, in any event, profits available for distribution shall accompany quarterly statements. Whenever any profit from the Joint Fund is distributed to either party, the profit accruing to the other party shall be paid at the same time.

"7. Within ten (10) days after the end of each quarterly period, Second Party shall issue a statement to First Party verifying the condition of the Joint Fund and the interest therein of the parties hereto at

determines that State's Exhibit 'A' is a security, and that defendant's connection with it was a sale?"

As the certified questions numbered 2 and 3 are determinative of the ultimate result, we shall proceed with consideration and determination of them in that order.

■ Does exhibit "A," viewing it broadly and considering its real purpose rather than limiting it to its label, come within our blue sky definition of a security? 1 Mason Minn. St. 1927, § 3996-1(3), defines the word as follows:

---

the close of business on the last day of such quarter. The first quarterly period shall end on the last day of the second month following the date of this Agreement, and each succeeding quarterly period shall include three full calendar months.

"8. The amount of the Joint Fund may be increased or decreased by mutual agreement of the parties hereto, and shall be increased or decreased automatically in line with changes in collateral value of securities furnished by First Party. As provided in Paragraph One, Second Party is hereby authorized and required to adjust his interest in the Joint Fund to at all times equal ten per cent (10%) of First Party's interest in it. An appropriate rider, supplementing this Agreement, and showing the respective interest of said parties after any increases or decreases shall be furnished to First Party by Second Party.

"9. This Agreement shall be in full force and effect from the date hereof until cancelled. It may be cancelled only after the end of the second month of the second quarterly period, except by mutual consent. Thereafter it may be cancelled at the end of any quarterly period by either party giving fifteen (15) days' written notice to the other party. But, if First Party desires to cancel this Agreement during any quarterly period after the end of the second month of the second quarterly period, he may do so by giving Second Party ten (10) days' written notice, and by payment to Second Party of a liquidating fee equal to five per cent (5%) of the First Party's interest in the Joint Fund. It is understood that a cancellation at the end of the second quarterly period or at the end of any succeeding quarterly period shall be without payment of a liquidating fee.

"10. In case of liquidation or cancellation of this Agreement, Second Party's interest in said Joint Fund shall be considered as a Loss Reserve, and shall be charged first with any losses, but if there be losses in excess of the amount of such Loss Reserve they shall be charged against First Party's interest.

" 'Security' shall mean and include any stock, share, bond, note, debenture, commercial paper, evidence of indebtedness, *investment contract. Interest in or under a profit sharing or participating agreement or scheme,* or beneficial interest in a trust or pretended trust. *Any interest in any security shall be deemed a security."* (Italics supplied.)

The clear purpose of all blue sky acts is to curb the activities of those who by ingenious subterfuge or by fraudulent means seem bent on disposing to the ignorant and gullible fraudulent or speculative securities. To make effective the legislative prohibition against such activities, courts have uniformly held that we should not place a narrow construction upon such enactments. This court has consistently so held, as for example in Kerst v. Nelson, 171 Minn. 191, 195, 213 N. W. 904, 905, 54 A. L. R. 495, where this thought is lucidly stated:

"In view of the ingenuity of those who seek to induce men and women to put their money into far-off speculative enterprises over which the investor has little or no control, and in view of the paternalistic character of blue sky laws, it should be the policy of the courts to refrain from hampering the state officials in the performance of their duties by placing a narrow construction on such laws."

Sustaining that view are, amongst other cases, Securities & Exchange Comm. v. Wickham (D. C.) 12 F. Supp. 245; Securities & Exchange Comm. v. Crude Oil Corp. (7 Cir.) 93 F. (2d) 844, 846;

"11. Neither party shall be liable to the other or to third persons in excess of his interest in the Joint Fund.

"Dated at Minneapolis, Minn. this 6th day of January, 1938.
"WITNESS: F. F. HOFACRE.

"MR. DONALD L. DRESSLER,
"MRS. ANNA M. DRESSLER,
"First Party.
"S. W. GONGOLL
"BY S. W. GONGOLL,
"Second Party."

and see also Anno. 87 A. L. R. 61, "Blue Sky Laws" under "V. Interpretation generally."

While the expressed purpose set forth in exhibit "A" is "to join funds on a partnership basis," a careful reading of what follows this declaration obviously points to something quite the opposite. There is nothing of substance in it, except Gongoll's bare label, that such a relationship should be established thereby. As will be seen, Gongoll was to furnish only ten per cent of the amount of the investor's capital contribution, yet was to receive one-half of all profits. The entire deal was placed in his complete and uncontrolled charge. All the capital assets and securities were held in his name. He alone had authority "to buy, sell, exchange, transfer, and trade, in any stocks, bonds, debentures, notes, warrants, or commodities listed or authorized to be traded in" on "legally recognized and established security and/or commodity exchanges or markets in the United States or Canada." Neither the investor nor Gongoll "shall be liable to the other or to third persons in excess of his interest in the Joint Fund." This limitation of the latter's liability to the investor is, on its face, inconsistent with the fiduciary obligation of one partner to another.

Rather, we think, this instrument is in the nature of an investment contract under the terms of which the investor deposited funds and securities with Gongoll, who, under the agreement, was to speculate in the various securities and commodities mentioned. The so-called "investor" had nothing to do with any transaction except to contribute 10/11 of the joint fund and for that should share the profits equally with the one contributing only 1/11. Paragraphs 9 and 10 of the agreement provide interesting reading and graphically portray the Gongoll spider web into which gullible persons might be, and according to indictment were, led. Of course only incidental reference is made to possible losses. In its actual operation the plan is to get the public to invest its money in a scheme or plan of speculation, exclusively handled and under the full control of Gongoll, who takes only a trifling risk, while the investor, in exchange for his money, gets

only the supposed benefit of Gongoll's presumed skill, honesty, and experience as a market manipulator.

The contract here involved is in its essential elements the same as the one considered in Securities & Exchange Comm. v. Wickham (D. C.) 12 F. Supp. 245, where the court came to the conclusion that it was in fact an investment contract or profit-sharing agreement and as such came within the provisions of 15 USCA, § 77b(1). The court there said (12 F. Supp. 248):

"The investing public expects to receive a profit or income from such investment, not by joint efforts, but by reason of the claimed skill, knowledge, and experience of the defendant and the possible good luck that he may have in his various ventures."

That case is cited with approval in Securities & Exchange Comm. v. Crude Oil Corp. 93 F. (2d) 846.

And in State v. Gopher T. & R. Co. 146 Minn. 52, 56, 177 N. W. 937, 938, this court said:

"The placing of capital or laying out of money in a way intended to secure income or profit from its employment is an investment as that word is commonly used and understood."

The court in the Crude Oil Corporation case (93 F. [2d] 847) lists numerous cases holding other but basically similar transactions to be securities under various state blue sky laws. We refrain from further mention of them as they are there adequately cited. In addition to the cases there cited, the following are helpful: Stevens v. Atlantic & Security Mut. Assns. Cons. 116 N. J. Eq. 584, 174 A. 744; People v. Sowall, 279 Mich. 261, 271 N. W. 751; Ryan v. State, 128 Fla. 1, 174 So. 438. Particularly helpful is "A Review of the Cases on 'Blue Sky' Legislation," written by Montreville J. Brown while assistant attorney general of this state, found in 7 Minn. L. Rev. 431, et seq. The cases on "Securities Covered by Law" are reviewed at p. 438, et seq.

We therefore conclude, as did the court in State v. Pullen, 58 R. I. 294, 192 A. 473, 476, that:

"Where a widespread evil, manifesting itself in an almost infinite variety of cunning schemes, exists by reason of which the public is victimized, and where the Legislature enacts a statute solely designed to remedy that particular evil, a broad construction should be given the statute."

So construing the statute as applied to the facts here appearing compels the conclusion that question No. 2 should be answered in the affirmative.

■ Defendant's next contention is that under the statutory definition there was no sale. 1 Mason Minn. St. 1927, § 3996-1(2), reads as follows:

" 'Sale,' 'sell' or 'sold' shall mean and include any disposition for value, an offer to sell, a solicitation of a subscription or sale, or an attempt to sell in any manner whatsoever, an option of sale, a subscription, a preorganization subscription or certificate, a reorganization subscription or certificate, an agreement to issue or transfer, an exchange, pledge, hypothecation or any transfer in trust or otherwise by way of mortgage. Any security given or delivered as a bonus with any sale of securities, as such sale is herein defined, or with any other thing, shall be conclusively presumed to constitute a part of the subject of such sale and to have been sold for value. Provided, however, that the sale of a security under conditions which entitle the purchaser or subsequent holder to exchange the same for, or to purchase, some other security shall not be deemed a sale or offer for sale of such other security; but no exchange for or purchase of such other security shall ever be made unless and until the sale thereof shall have been first authorized in Minnesota by registration under this act, or by exemption therefrom, or by other provisions of law."

It is said that "there has been no disposition of anything for value; * * * no offer to sell anything"; "no solicitation of a subscription or sale"; that the investor "has purchased nothing * * * received no interest in any specific property, * * * parted with nothing, not even the title to her money," because

upon certain conditions she "is entitled to receive same back and to have the agreement cancelled."

As will be seen by referring to § 9 of the agreement, provision is made that it shall be "in full force and effect from" its date and "until cancelled. It may be cancelled *only after the end of the second month of the second quarterly period,* except by mutual consent." Thereafter it might be cancelled at the end of any quarterly period upon giving 15 days' notice. "But, *if First Party desires to cancel this Agreement* during any quarterly period after the end of the second month of the second quarterly period, *he may do so by giving Second Party ten (10) days' written notice, and by payment to Second Party of a liquidating fee equal to five per cent (5%) of the First Party's interest in the Joint Fund."* (Italics supplied.)

It is apparent that Gongoll was to put the investor's money, including his own contribution, to immediate use. There was no "profit" to be gained otherwise. Hence, until property had been bought and later sold at a higher figure there was nothing to divide. That it was so put to prompt use, assuming Gongoll's honesty of purpose, and within the noncancellation period, is apparent.

Defendant's position is difficult to understand. At page 4 of his brief we are asked to "carefully examine and study the agreement." If we do so we are assured of finding that "the agreement is a partnership contract and refers to a joint fund * * * furnished" by the parties to the transaction. While at page 12 thereof he tells us that we "will find embodied in" it "certain elements of a partnership agreement, but *in the final analysis, we believe, that the agreement constitutes a simple agency agreement* * * *." (Italics supplied.)

Defendant's uncertainty in respect to the meaning of his employer's contract, prepared for his special use, illustrates the duplicity of the undertaking. Any reasonably prudent person desiring to deal fairly with his fellow men and be obedient to the law would have sought determination of its validity from the

securities commission before foisting it upon the unsuspecting public.

Gongoll, to the extent of his cash investment plus his claimed possession and exercise of special skill, had something to sell; at least, neither he nor the defendant is in position to claim otherwise. By its terms, the investor purchased a portion of the expected gain; there was a "disposition for value" of an interest in physical property, the selection whereof, the price to be paid, when to sell or exchange for something else, were all in Gongoll's hands. The investor bought and Gongoll sold a specified interest in gains to be had out of the transactions.

The situation here is in substance and effect precisely the same as that considered and determined in the Wickham case, 12 F. Supp. 245. There defendant invited the public by means of advertising and solicitation to enter into contracts with himself by the terms of which they supplied the capital, defendant his skill and experience in market dealings. There the contract holders stood all losses, profits were divided 60 per cent to the purchaser, 40 per cent to defendant. Upon the question of what a purchaser *bought* in such a case the language there used by the court is equally apt here (12 F. Supp. 248, 249):

"Whether one invests money in the proverbial gold mine where he receives a certificate evidencing his contribution and resulting interest in the profits which are anticipated, or invests in a speculative venture by reason of the claimed skill and experience of a grain and stock market manipulator to make profits, the transactions cannot be rationally distinguished in determining the dealings which Congress intended to regulate in using the term 'investment contract.' Both are investments that the law seeks to supervise and regulate to prevent abuses and afford the investing public some measure of protection. Both entail the issuance of a security. In one the investor expects profits by reason of the gold to be mined; in the other, by reason of the skill and experience of the defendant in the market. In both, the opportunities for fraud are notorious."

An interesting and instructive note is found in 30 Mich. L. Rev. 1113, 1114. The author in favorably commenting upon the decision in Brownie Oil Co. v. Railroad Comm. 207 Wis. 88, 240 N. W. 827, 87 A. L. R. 33, had this to say:

"The decision reiterates the broad, expansive policy adopted by the courts in their construction of 'blue sky' legislation similar to that involved in the instant case." (Citing numerous cases.) "Underlying this policy is the necessity of avoiding hard and fast rules which would only serve to challenge the ingenious to devise more devious schemes aimed to circumvent such fixed obstacles. See 19 Cal. L. Rev. 641 (1931). However, at least one criterion seems well established—some interest to the investor in the profits of the proposed venture must inhere in the scheme. (See cases cited supra.) Minnesota has perhaps gone farthest in extending to the investor the protection of such 'blue sky' laws against many questionable get-rich-quick investment devices." Citing in support the following cases decided by this court: State v. Gopher T. & R. Co. 146 Minn. 52, 177 N. W. 937; State v. Evans, 154 Minn. 95, 191 N. W. 425, 27 A. L. R. 1165; State v. Ogden, 154 Minn. 425, 191 N. W. 916; State v. Swenson, 172 Minn. 277, 215 N. W. 177; Kerst v. Nelson, 171 Minn. 191, 213 N. W. 904, 54 A. L. R. 495.

We note the author's comment that this court "has perhaps gone farthest in extending to the investor the protection of such 'blue sky' laws." Reviewing the cases generally and our own in particular, it does not occur to us that we have gone too far, but rather, and only, that by construing the law broadly we have simply given effect to the obvious legislative purpose as expressed in the law and have recognized that there is and has been "a widespread evil, manifesting itself in an almost infinite variety of cunning schemes," to victimize the public by sales of worthless or purely speculative securities, which evil the legislature by this enactment has sought to remedy. We must ever be mindful that, "judges have neither higher function, nor more pressing duty, than to ascertain and give full scope to declared legislative policy when

within the competency of the enacting body." And that, "however radical the change, a statute inaugurating new policy 'should have a fair construction, with the purpose of its enactment in view, not narrowed or restricted because it is a substitute for the discarded common law.'" State ex rel. City of St. Paul v. M. St. P. & S. S. M. Ry. Co. 190 Minn. 162, 165, 251 N. W. 275, 277.

There was here a sale by defendant of "some interest to the investor in the profits of the proposed venture." So question No. 3 must also be answered in the affirmative.

Questions Nos. 1, 2, and 3 are answered in the affirmative, question No. 4 in the negative.

The cause is remanded to the trial court for further proceedings according to law.

So ordered.

