## ELSIE K. BATES v. EQUITABLE LIFE ASSURANCE SOCIETY OF UNITED STATES AND ANOTHER.[1]

December 15, 1939.

No. 32,212.

*Fred A. Ossanna, Edward J. Kotrich,* and *George A. French,* for appellant.

*Kellogg, Morgan, Chase, Carter & Headley, David W. Raudenbush,* and *Samuel H. Morgan,* for respondents.

JULIUS J. OLSON, JUSTICE.

Plaintiff appeals from an adverse judgment entered after trial had and upon findings made by the court. No issue of fact is presented. The problem is purely one of law.

On October 29, 1935, defendant issued a life annuity contract whereby, in consideration of $1,500 duly paid, it agreed to pay to Alice H. Knudtson, quarterly, during her lifetime, $26.98 beginning with January 25, 1936. Annuitant died January 15, 1937, and plaintiff was appointed representative of her estate. At the time of her death only four quarterly payments had accrued, and these had been punctually met.

[1]Reported in 288 N. W. 834.

This form of contract and many others of like tenure were not registered with or approved by the securities commissioner. Nor was this an isolated sale but rather one out of many made in the course of defendant's business. Plaintiff claims that this instrument is a "security" or "investment contract" as defined by our blue sky law, 1 Mason Minn. St. 1927, § 3996-1, *et seq.* and as such is and should be subject to its provisions; that not having been so registered and approved its issuance was contrary to law, thereby voiding it; hence that plaintiff is entitled to recover the consideration paid less the amount received during annuitant's lifetime. Plaintiff argues that the exception provided by 3 Mason Minn. St. 1938 Supp. § 3996-2(7), which reads: "Policy contracts of insurance companies licensed to do business in this state," is of no avail to defendant as, so she claims, the contract is not a "policy" at all but that it is an "investment contract."

There is no question about defendant being an insurance company duly licensed and doing business as such in this state. And, as we have seen, the contract has been fully performed by the parties thereto in exact conformity with its terms. Likewise, it is perfectly clear that the basis upon which the promised payments were to be met is founded upon actuarial computation based upon the experience furnished by authentic mortality tables used by insurance companies in writing this form of contract. Obviously, too, neither annuitant nor defendant could know as a matter of certainty when annuitant would die. She was 63 years of age when the contract was made. Her life expectancy was 17.12 years. She might die soon after issuance of the contract, but there was also a fair chance that she might live many years beyond her expectancy. Expectancy is arrived at by the law of averages. The individual is but one of many contributing to the common fund out of which annuity payments are to be met. All are subject to the risks and uncertainties of life's tenure. So the contract is one having at least many things in common with what is commonly known as "policy risks." To the average person reading this instrument that would be the interpretation of it. Just as the average wage earner insures his life to protect his

family in event of his untimely departure, so plaintiff's intestate purchased a life annuity to the end that she might be assured of a definite income during the remaining days of her life. In a fundamental sense the money so paid by her operated and made effective the same objective as would the premiums paid by the wage earner to protect those who are his dependents. While here the motivating impulse was not protection to others but rather and only to the annuitant, yet the thing desired and procured was security of income against investment hazards and uncertainties for the duration of annuitant's life. The mortality tables put in evidence as plaintiff's exhibit "B" disclose that of 71,871 females of annuitant's age (63 years) life would terminate at some point between that year and 49 years thereafter, when, theoretically, none of that group would be living.

Our insurance laws are collected in 1 Mason Minn. St. 1927, c. 19. Under § 3287 there is "established and continued a department of insurance" the "chief officer" of which "shall be styled the Commissioner of Insurance." As such he [§ 3288] "shall have and exercise the power to enforce all the laws of this state relating to insurance, and it shall be his duty to enforce all the provisions" thereof. Subsequent sections set up a workable scheme in respect to an official staff to make effective the provisions of such laws. Broad powers are granted to the commissioner (§§ 3297 to 3311, inclusive) in respect to the licensing and supervision of insurance companies. Methods and means to be employed if any such company is found to be "in an unsound condition" or "has failed to comply with the law," etc. are prescribed.

Under "General Provisions" (§§ 3312 to 3347, inclusive), as the heading implies, we find directions dealing with insurance and insurance companies generally. Section 3314 defines insurance, and the next section (3315) prescribes the kind of business which may be transacted by insurance companies after having been licensed to do business by the commissioner. It provides:

"(a) Insurance corporations shall be authorized to transact * * * any of the following kinds of business, * * *

"4. To make contracts of life and endowment insurance, to grant, purchase, or dispose of annuities of [or] endowments of any kind, and to insure against accidents to or sickness of the assured."

Under subdivision (b):

"The paid-up capital stock of every such corporation authorized to transact the kinds of business enumerated in sub-divisions 1 to 15 of this section shall not be less than specified below: * * *

"Subdivision 4, $100,000."

Related to this section is § 3319, which provides:

"No company in this state * * * shall do business in this state unless it has on deposit with the insurance commissioner of this state as security for all its policyholders, * * * [describing certain classes of assets] the actual market value of which exclusive of interest, shall never be less than one hundred thousand dollars, * * *."

So it seems clear that these provisions permit the issuance by life insurance companies of life and other annuities in this state. Adequate capital is required for the right to engage in and to continue that kind of business. Every reasonable safeguard is provided to the end that the public may not be subjected to the losses or impositions that often attend the fly-by-night concerns against which the blue sky law is especially directed. That is evidenced by the high class of assets and their worth required by the law to be deposited with the insurance commissioner "as *security* for all its [the insurance company's] *policyholders.*" (Italics supplied.)

And there are other provisions in that chapter unerringly pointing out that all kinds of insurance upon or involving "continuance or cessation of human life," whether ordinary life, endowments, and annuities of whatever kind, issued by regularly licensed insurance companies, lie exclusively within the insurance

commissioner's jurisdiction. Thus § 3372, so far as here material, reads:

"Every corporation * * * operating upon any plan involving payment of money * * * to policy or *certificate holders,* * * * *conditioned upon the continuance or cessation of human life, or for the payment of endowments or annuities* * * * shall be deemed a life insurance company, * * *." (Italics supplied.)

Section 3399 prescribes certain "standard forms" of policies which insurance companies may write. There are limits in the act prescribing what must be included in every policy, and many provisions are listed which no policy may contain. The commissioner is required to approve the forms of contracts proposed to be issued. But § 3410 provides: "This act shall not apply to annuities, industrial policies," etc.

Viewing the act as a whole, it seems clear that life insurance companies issuing policy or other forms of contracts "conditioned upon the continuance or cessation of human life" are subject to many regulations, but all are under the jurisdiction of the insurance commissioner, and nowhere is there any mention made that the securities commission is to participate in any way.

The insurance laws to which we have referred antedate the blue sky law by many years. The original blue sky act was enacted in 1917 (L. 1917, c. 429). Under § 2 thereof provision was made that the act "shall not apply to * * * (d) securities of * * * insurance companies under control of the commissioner of insurance." Subsequent amendments have not essentially changed the insurance commissioner's originally granted supervisory and regulatory jurisdiction on the subject of offerings by insurance companies.

While the contract here involved is not, strictly speaking, a "policy" as that term is generally understood and applied, yet we think it falls clearly within the quoted exception provided under the blue sky act. We are fortified in this view by the long and uninterrupted practical construction given to the act by the securities commission in that no effort has been made to exercise

authority in matters of this kind, the exclusive control thereof having been exercised by the insurance commissioner. In re Estate of Boutin, 149 Minn. 148, 150, 182 N. W. 990.

On the subject of whether the blue sky law excludes this form of contract, Rinn v. New York L. Ins. Co. 89 F. (2d) 924, is helpful.

Judgment affirmed.