# STATE, BY THE ATTORNEY GENERAL, WARREN SPANNAUS, AND OTHERS v. INVESTORS SECURITY CORPORATION AND OTHERS.

209 N. W. 2d 405.

July 13, 1973—No. 43425.

*Russell J. Jensen,* for appellants.

*Warren Spannaus,* Attorney General, *Curtis D. Forslund,* Solicitor General, and *Thomas B. Sedgwick,* Assistant Attorney General, for respondents.

PETERSON, JUSTICE.

Defendants, Investors Security Corporation and associated personnel, appeal from an order entered by the district court, upon application of the State of Minnesota, which among other proscriptions permanently enjoins them from selling certain unregistered securities in this state. The sole issue we need decide is whether those securities are, as the district court found,[1]

---

[1] After a trial on the merits, the district court concluded:

"1. The instruments offered and sold by the defendants are securities within the meaning of Minn. Stats., sec. 80.01, subd. 4 (1969).

"2. The exemptions from registration provided by Minn. Stats., sec. 80.06, subd. 3 (1969) are not applicable to the sales of instruments by the defendants to Minnesota investors inasmuch as such sales are made in part by contract for deed and assignment of the interests covered therein and in part by sales of assignments of notes secured by a mortgage lien but which are not sold to a single purchaser at a single sale within the meaning of the cited statutory subdivision.

"3. The defendants have violated Minn. Stats., sec. 80.07 (1969) by offering for sale and selling securities which are not registered and which are not subject to registration under Minn. Stats., sec. 80.05 (1960) and which, further, are not sold in sales which are exempt under the provisions of sec. 80.06, subd. 3 (1969).

"4. The defendants, and each of them, have violated Minn. Stats., sec. 80.18 (1969) by publishing, circulating and distributing advertisements, printed matter, circulars and other sales literature pertaining to the sale of an unregistered security.

"investment contracts" within the context of Minn. St. 1971, § 80.01, subd. 4, and thus subject to the registration provisions of our securities statutes.[2] We affirm.

In January 1971, Midwest Arrow Wash, Inc., a Minnesota corporation, became, through a corporate metamorphosis, Investors Security Corporation (hereafter ISC) and immediately began to offer and sell instruments pertaining to raw, undeveloped Arizona land to Minnesota residents. Thereafter, until April 7, 1971, defendant ISC sold contracts for deed, notes secured by contracts for deed, and notes secured by mortgages[3] which were issued by six Arizona land developers: Sunshine Land & Cattle Corporation, Lake Havasu Estates, Havasu Terrace Land Company, Phoenix West Corporation, New Life Trust, Inc., and Greer Engineering Company. ISC has not applied in Minnesota for the registration of any securities whether its own or those of another, and none of the developers' instruments sold by ISC were registered with the State of Minnesota as securities.

ISC is in the business of assisting the Arizona land developers in their efforts to obtain money from the public in order to subdivide and further develop these desert subdivisions. While many

"5. The defendants, and each of them, have violated Minn. Stats., sec. 80.12 (1969) by offering for sale and selling securities without having been licensed as a broker-dealer.

"6. The defendants, and each of them, have violated Minn. Stats., sec. 80.13 (1969) by acting as a securities agent without first having obtained a license."

[2] Minn. St. 1971, c. 80, was repealed by L. 1973, c. 451, § 32, and replaced by c. 451, §§ 1 to 31 (tentatively coded Minn. St. c. 80A). Prior law governs all proceedings pending on, or initiated on the basis of facts occurring before, August 1, 1973. L. 1973, c. 451, § 32, subd. 2.

[3] Defendants have attempted to limit their appeal to only the issue of whether the notes secured by first mortgages are subject to the registration requirements of Minn. St. 1971, c. 80. Any differences in the various forms of transactions, however, are simply differences in matters of form and "investment" technique, not of substance.

different forms of instruments are employed, the transactions can be generally classified into two categories. Under one form of transaction, an Arizona developer sells raw land to an individual purchaser. The land is sold either by contract for deed or by taking the purchaser's note, which is secured by a mortgage naming the Arizona developer as mortgagee. The developer then mails a package of instruments pertaining to the land transaction to ISC in Minnesota. All of the instruments are in such form that they can be conveyed directly from the Arizona developer to a Minnesota investor. In the case of a sale by contract for deed, the Arizona developer's vendor's interest in the land is assigned in blank with the eventual assignee to be filled in later. When the note and mortgage form is used, the note is endorsed in bearer form, and the Arizona developer's mortgagee's interest in the land is assigned in blank. ISC negotiates with each Arizona developer the amount of a discount to be allowed upon the particular instruments involved. All agreements between ISC and Arizona developers are of a verbal nature. The discounts range from 18 percent to 36 percent and vary according to the individual developers. ISC sells the instruments to Minnesota investors after discounting the face value of the instruments in an amount sufficient for the investor to receive an annual yield of from 10 percent to 12 percent (assuming payments are made as promised). ISC retains the difference between the cost of the instruments from the developer and the sale price to the Minnesota investor.

In a second form of transaction, one Arizona developer, New Life Trust, Inc., arbitrarily determines the value of a parcel of land and issues its own note and mortgage upon that land. The note and mortgage are then mailed to ISC with the names of the payee on the note and the mortgagee on the mortgage left blank. Again ISC arranges for a discount with the developer and passes part of the discount on to the Minnesota investor. The interest rate to be derived by the investor is again 10 percent to 12 percent. In this transactional form, the developer either remits

monthly principal and interest payments directly to the Minnesota investor, or, alternatively, the developer remits monthly interest payments only, and retains an obligation to make a lump sum principal payment 3, 5, or 7 years later. Under the terms of the note involved in this form of transaction, the Minnesota investor is limited to foreclosure of the mortgage in the event of a default. However, ISC has, over the period of time it has done business, offered various guarantees of its own with respect to the investments it sold, and ISC has occasionally made monthly payments to investors when the developer is delinquent.

All of the Arizona developers, except New Life Trust, Inc., provide a recourse agreement whereby if the land purchaser defaults on his payments, the investor has the right to require the developer to substitute a new note and mortgage or, as the case may be, a new contract for deed which provides the investor rights identical to those he had in the agreement which was defaulted upon. The developer selects this replacement contract. ISC consistently advises investors to look to the developer or itself for payment should the land purchaser default, and not to pursue foreclosure remedies.

ISC has never had any financial data with respect to any of the developers, nor has ISC ever investigated the financial standing of any of the developers. ISC makes no appraisals with respect to the land underlying any of the instruments sold to investors, and has no data concerning such land values. No information is given to the Minnesota investor concerning the proposed improvements to the land which the developer is obligated to make, and no information concerning the extent to which the value of the land is inflated because of promised improvements is given to Minnesota investors. ISC has no information regarding what percentage of the value of the underlying land is represented by the amount recited in an individual contract or note and mortgage. ISC has no title opinions from Arizona counsel or other counsel with regard to any parcel of land which is the subject of the aforementioned instruments, and ISC does not

undertake any investigation with respect to any possible encumbrances on this land.

Credit information regarding the ability of the land purchaser to make payments is not available to the Minnesota investors. ISC has never made any inquiries with regard to the credit standing of the land purchaser. Investments are sold to Minnesota investors in accordance with the amount of money the investor has to invest and without regard to the identity of the developer, quality of the underlying land, financial ability of the underlying land purchaser, or legal distinctions with regard to the particular instruments involved. ISC is not selective regarding which instruments it obtains from a developer, but rather attempts to obtain all that are available. Because of the great distance between the land and the investor, most investors never inspect the land underlying their investments before they purchase the instruments.

When a land purchaser is involved, the investor has the option to have payments collected by the Arizona developer or the developer's agent and then remitted to the Minnesota investor. The investor normally elects to have the collection conducted by this method. In addition, the developer or its agent obtains title insurance on the property and handles the recording of instruments for the Minnesota investor.

ISC initiates contact with investors by placing advertisements in local newspapers asking potential investors to place their savings with ISC in order to earn 10 percent to 12 percent interest upon "insured first mortgages * * * Fully secured * * * Full Recourse. INTEREST and principal paid monthly." Upon receipt of an inquiry from an investor, ISC mails literature to the investor describing the instruments as "title insured real estate mortgages and contracts" and stating that "[a]ll mortgages and contracts are subject to recourse from the developer for your additional security" and "the developer agrees to full recourse for maximum investor security." After an investor indicates the amount he wishes to invest, ISC selects a contract

or mortgage in that amount and transfers it and other instruments pertaining to it to the investor.

Minn. St. 1971, § 80.01, subd. 4, includes both notes and investment contracts within the meaning of "security." Defendant ISC acknowledges that the notes are "securities" within the meaning of Minn. St. 1971, c. 80. It contends, however, that its instruments are only notes and not investment contracts, and, as notes, they come within the "single purchaser-single sale" exemption of § 80.06, subd. 3. We hold that, irrespective of the commercial status of these securities as notes, the nature of the economic inducements for the public to invest in these instruments, together with the terms of the offers and the methods by which distribution is made, are such as to constitute the whole of the transactions as "investment contracts" for purposes of c. 80. As defendant concedes, a holding that these various instruments constitute investment contracts renders the statutory exemption inapplicable.

"Investment contract" is not defined under c. 80. It is likewise undefined under the Federal securities statutes. ISC seeks to interpret the Minnesota statutes according to judicial determination under the Federal statutes.[4] It is important to note, at the outset, that, despite procedural similarities of both sets of statutes, their underlying philosophies and basic approaches are fundamentally different. The central concept of the key Federal statutes—the Securities Act of 1933, 15 USCA, § 77a, et seq., and the Securities Exchange Act of 1934, 15 USCA, § 78a, et seq. —is "full disclosure," rather than any substantive inquiry into the merit of the securities being issued or sold. 1 Loss, Securities Regulation (2 ed.) p. 123. Chapter 80, on the other hand, adheres

---

[4] S. E. C. v. W. J. Howey Co. 328 U. S. 293, 66 S. Ct. 1100, 90 L. ed. 1244 (1946); S. E. C. v C. M. Joiner Leasing Corp. 320 U. S. 344, 64 S. Ct. 120, 88 L. ed. 88 (1943); S. E. C. v. Los Angeles Trust Deed & Mortgage Exch. 186 F. Supp. 830 (S. D. Cal. 1960), modified and affirmed, 285 F. 2d 162 (9 Cir. 1960), certiorari denied, 366 U. S. 919, 81 S. Ct. 1095, 6 L. ed. 2d 241 (1961).

to the opposite philosophy—that of regulating the merits of the securities by the application of statutory guidelines. Perlman, *A Critical Analysis of the Registration Provisions of the Minnesota Securities Act,* 56 Minn. L. Rev. 523, 526.

The heart of Minn. St. 1971, c. 80, is found in § 80.07, which provides in part:

"No securities, except those exempt under section 80.05 and those sold in sales exempt under section 80.06, shall be offered for sale or sold within the state unless such securities have been registered pursuant to sections 80.08 or 80.09, except that it shall be permissible for licensed broker-dealers and agents to offer for sale in Minnesota prior to registration securities for which a registration statement has been filed under the Federal Securities Act of 1933."

The commissioner of securities may deny an application for registration (§ 80.08)—

"* * * if [he] is of the opinion that the securities are fraudulent, or if it appears to [him] that the sale thereof would work a fraud or deception on the purchasers thereof, or if the proposed plan of business of the issuer and the terms of the securities are unfair and unjust, or if the applicant has violated any of the provisions [of the Act relating to exemption or registration] or any registration or lawful order of the [commerce] commission, or for good cause appearing to the commission."

Accordingly, this court has consistently taken an expansive view of our securities statutes. This expansive view has led to a consistent broadening of the coverage of these statutes.[5] Of

---

[5] See, e. g., Donovan v. Dixon, 261 Minn. 455, 113 N. W. 2d 432 (1962) (guaranty fund certificates issued by mutual insurance company are securities); Virnig v. Smith, 252 Minn. 363, 90 N. W. 2d 241 (1958) (interests in joint venture are securities); State v. Lorentz, 221 Minn. 366, 22 N. W. 2d 313 (1946) (contracts for burial lots are securities); State v. Golden, 216 Minn. 97, 12 N. W. 2d 617 (1943) (oil interests are securities); State v. Hofacre, 206 Minn. 167, 288 N. W. 13 (1939) (interest in investment account entirely controlled by one contributor a security);

particular importance to the instant matter are our decisions in State v. Gopher Tire & Rubber Co. 146 Minn. 52, 177 N. W. 937 (1920), and State v. Lorentz, 221 Minn. 366, 22 N. W. 2d 313 (1946). In the landmark Gopher Tire case this court gave a broad definition to the word "investment" in the context of the term "investment contract" (146 Minn. 56, 177 N. W. 938):

"No case has been called to our attention defining the term 'investment contract.' The placing of capital or laying out of money in a way intended to secure income or profit from its employment is an investment as that word is commonly used and understood. If defendant issued and sold its certificates to purchasers who paid their money, justly expecting to receive an income or profit from the investment, it would seem that the statute should apply."

In Lorentz, which is factually more on point, this definition was applied to the sale of contracts for deed and deeds to burial lots in a new cemetery, promoted by defendant, to various persons, some of whom purchased in large quantities. Defendant told

---

State v. Robbins, 185 Minn. 202, 240 N. W. 456 (1932) (fur farm profit-sharing contracts are securities); State v. Code, 178 Minn. 492, 227 N. W. 652 (1929) (interests in invention being developed are securities); Webster v. U.S.I. Realty Co. 170 Minn. 360, 212 N. W. 806 (1927) (land contracts with options are investment contracts); Kerst v. Nelson, 171 Minn. 191, 213 N. W. 904 (1927) (land contracts by which seller agrees to cultivate and market crops and share proceeds with purchaser are securities); State v. Swenson, 172 Minn. 277, 215 N. W. 177 (1927) (interest in invention a security); State v. Bushard, 164 Minn. 455, 205 N. W. 370 (1925) (contract for sale of bus with profit-sharing arrangement a security); State v. Ogden, 154 Minn. 425, 191 N. W. 916 (1923) (profit-sharing contract a security); State v. Evans, 154 Minn. 95, 191 N. W. 425 (1922) (contract which included option to purchase real estate a security); State v. Gopher Tire & Rubber Co. 146 Minn. 52, 177 N. W. 937 (1920) (investment contract a security). But see, Bates v. Equitable Life Assur. Society, 206 Minn. 482, 288 N. W. 834 (1939) (annuity contract not a security); Busch v. Noerenberg, 202 Minn. 290, 278 N. W. 34 (1938) (unless incident to an interest in profits from tract, contract for undivided interest in land not a security).

prospective purchasers that a good profit could be made on the resale. We held that since the lots were sold for speculative purposes and not primarily for burial use, and since the value of the lots depended on future development of the cemetery rather than on present assets, the instruments were investment contracts within the meaning of the statute. We there cited the case of S. E. C. v. C. M. Joiner Leasing Corp. 320 U. S. 344, 64 S. Ct. 120, 88 L. ed. 88 (1943), and quoted, with approval, the following (320 U. S. 352, 64 S. Ct. 124, 88 L. ed. 94):

"* * * In applying acts of this general purpose, the courts have not been guided by the nature of the assets back of a particular document or offering. The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be."

We are faced again with determining whether we should adhere to a broad and flexible definition of the term "investment contract." We have traditionally viewed securities acts as remedial or "paternalistic," liberally interpreting them in the light of the abuses which induced their enactment. State v. Hofacre, 206 Minn. 167, 288 N. W. 13 (1939). Too rigid a definition of "investment contract" would frustrate this objective. S. E. C. v. C. M. Joiner Leasing Corp. *supra,* which cited Hofacre, similarly disclaimed giving a fixed, comprehensive definition to the term, simply concluding from the contracts and documents before it that "[t]he trading in these documents had all the evils inherent in the securities transactions which it was the aim of the Securities Act to end." 320 U. S. 349, 64 S. Ct. 123, 88 L. ed. 92.

S. E. C. v. W. J. Howey Co. 328 U. S. 293, 66 S. Ct. 1100, 90 L. ed. 1244 (1946), arising out of facts similar to those in Joiner, arguably deviated from the Joiner approach. Joiner involved the sale of assignments of oil leases, with the Joiner Company

drilling test wells. Howey involved the sale of small plots of Florida lands for the growing of citrus fruit, with an affiliate company, under common control and management, making service contracts with the plot purchaser for the development and cultivation of the land and marketing of the citrus crops. Purchasers were advised that it was not feasible to operate the plots individually, and, indeed, no attempt was made to segregate the extremely small tracts other than by a notation in the plat record book. Some 85 percent of the purchasers bought the service contract, the overwhelming majority of the land sales being made to nonresident people who lacked the knowledge and equipment necessary for the care and cultivation of citrus trees. In holding the sales and service agreement to be an "investment contract," Howey stated a more rigid definition consisting of three elements: (a) the investment of money, (b) a common enterprise, and (c) the expectation of profits or return on the investment, the profits to be generated solely by the efforts of the promoter or third parties. The Howey definition of an "investment contract" is, of course, more definitive than that in Gopher Tire. Acknowledging that the Howey test is useful in identifying most "investment contracts," we decline to adopt it as exclusive under our statute.

We are fully persuaded that the dealings of ISC in this case fall within the Howey definition, as well as the more general Gopher definition. There is little doubt that the "customers" of ISC invested their money in a common enterprise with the expectation of profits solely through the efforts of others. The facts demonstrate that the credit standing of the land purchaser is considered immaterial to the transaction. No information regarding the land purchaser is given to the investor. If a default occurs, the investor is counseled to look to the developer or ISC. Basic disclosure concerning the value of the underlying land, existence of prior liens, and inflation of land value because of improvements promised by the developer is considered superfluous and never made. It is obvious, therefore, that it is the

developer's recourse and servicing commitments, along with ISC's "guaranteed" 10- to 12-percent interest rate and implied investigating service which give the investments "most of their value and all of their lure." S. E. C. v. C. M. Joiner Leasing Corp. 320 U. S. 344, 349, 64 S. Ct. 120, 123, 88 L. ed. 88, 92.

The great distance between the investor and the maker of the note and the underlying land renders collection or foreclosure, in the event of default, a practical impossibility for the investor, necessitating reliance upon the commitments and guarantees of ISC and the developer. The ability of ISC and the developer to make good their obligation to the investor is indeed "the thread on which everybody's beads [are] strung." S. E. C. v. C. M. Joiner Leasing Corp. 320 U. S. 344, 348, 64 S. Ct. 120, 122, 88 L. ed. 88, 92. Without question, the economic welfare of the investor is inextricably interwoven with the financial prospects of the developer and ISC and the continuing ability of the developer to honor its endorsement of the land purchaser's note and mortgage. See, Los Angeles Trust Deed & Mortgage Exch. v. S. E. C. 285 F. 2d 162 (9 Cir. 1960), certiorari denied, 366 U. S. 919, 81 S. Ct. 1095, 6 L. ed. 2d 241 (1961).

The existence of a "common enterprise" has never been an acid test to determine whether an investment contract is present. "Common enterprise" can be no more than an aid to reasoning rather than a strict mechanical test. Nevertheless, the fact that all investors are dependent upon the economic welfare of the same parties, are subject to the risks of the same parties, and will profit along with these parties, by any definition satisfied the "common enterprise" reasoning.

S. E. C. v. Lake Havasu Estates, 340 F. Supp. 1318 (D. Minn. 1972), is of interest as an action under the Federal securities statutes against one of the developers with whom ISC dealt. Transactions there had garnered approximately $3,500,000 in publicly invested money. The only distinction in material fact between the instant case and Lake Havasu is in the marketing method used. There the developer engaged in the direct sale of

securities to investors without the aid of a middleman such as ISC. The contractual documents underlying the sole transaction between Lake Havasu and the land purchaser consisted of a land-purchase contract and a note. In its reselling program, Lake Havasu sold these instruments to public investors at a price based on the unpaid principal balance of the note. As Judge Earl R. Larson stated (340 F. Supp. 1318, 1321):

"Because the investors, normally, rely solely on Lake Havasu for selection of the land (from which the investor is separated by great distance), selection of the land purchaser (whose credit standing is not investigated), selection of the specific contract to be sold to the investor, collection agent services, guarantee of monthly payments, guarantee of replacement of any land purchase agreement which is defaulted, and arrangements for transfers and recordings among Lake Havasu, the land purchaser and the investor, the contracts distributed by Lake Havasu are 'investment contracts' and hence securities within the statutory definition."

But for the introduction of a middleman, the factual setting was identical to this case. Judge Larson, in what we consider a soundly reasoned decision, rejected numerous arguments which were also made by defendant in this case.

Defendants have appealed to this court only the sale, by ISC, of investments involving notes secured by first mortgages. We perceive no analytical difference between these particular instruments and the other instruments sold by ISC, for the substance of these various transactions is identical. Judicial consideration extends to the overall concept of ISC's contracts from inducement to formal consummation and beyond. Continental Marketing Corp. v. S. E. C. 387 F. 2d 466 (10 Cir. 1967). The test, as stated in S. E. C. v. C. M. Joiner Leasing Corp. 320 U. S. 344, 352, 64 S. Ct. 120, 124, 88 L. ed. 88, 94, is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect. Paraphrasing from the opinion of Mr. Justice

Jackson in Joiner, it is not inappropriate in the enforcement of our statute that, among other tests, the promoter's "investment" offerings be judged as being what they are represented to be.

Affirmed.

MR. JUSTICE YETKA and MR. JUSTICE SCOTT, not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.