**R. A. HABERMAN, Jr.,** Independent Executor of the Estate of Elizabeth H. Gravis, Deceased, Appellant,

v.

**The EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES,** Appellee.

No. 15330.

United States Court of Appeals
Fifth Circuit.

June 30, 1955.

Rehearing Denied Sept. 16, 1955.

See 225 F.2d 837.

· Frank M. Rosson, Fritz K. Knust, San Antonio, Tex., for appellant.

Garrett R. Tucker, Jr., Houston, Tex., Baker, Botts, Andrews & Shepherd, Houston, Tex., of counsel, for appellee.

Before HUTCHESON, Chief Judge, and TUTTLE and CAMERON, Circuit Judges.

TUTTLE, Circuit Judge.

This appeal is from a declaratory judgment holding that appellant, hereinafter called Haberman, is not entitled to restitution or refund of the consideration paid by his testatrix to appellee, hereinafter called Equitable, for a certain annuity policy, in excess of the payments already made to testatrix or her estate. The following statement of the facts and issues is adapted from the agreed statement made by the parties in accordance with Rule 76, Federal Rules of Civil Procedure, 28 U.S.C.A.

Haberman is a resident of San Antonio, Texas, and Equitable is a New York corporation conducting a life insurance and annuity business in Texas. On April 8, 1946, Equitable issued to Mrs. Elizabeth H. Gravis of San Antonio its Refund Annuity No. 12,142,208, for $50,000 paid by Mr. Gravis. Haberman, Mrs. Gravis' brother and financial advisor, handled, on her behalf, the negotiations for and purchase of the annuity.

At all material times, Equitable had complied with the laws of Texas relating specifically to foreign corporations engaged in the life insurance and annuity business in that State. It had obtained from the Board of Insurance Commissioners of Texas pursuant to Vernon's Texas Civil Statutes, Art. 4751 (now

Art. 3.57, Tex.Ins.Code), a Certificate of Authority expressly authorizing Equitable "to transact life, health, accident and annuity insurance in the State of Texas." The agent who represented Equitable in the sale of the annuity to Mrs. Gravis had been duly licensed by the Board of Insurance Commissioners of Texas, pursuant to Art. 5068b (now 21.07, Tex.Ins.Code). Equitable had appointed the Chairman of the Board of Insurance Commissioners of Texas as its agent for service of process, as required by Art. 4763 (now Art. 3.65, Tex.Ins.Code).

Equitable had not registered the annuity as a "security" under the Texas Securities Act, Art. 600a, nor qualified under that act as a "securities dealer." Its agent had not been licensed or registered under that act as a "securities dealer" or "securities salesman." Nor had Equitable filed a power of attorney with the Secretary of State of Texas designating a resident agent for service of process under Art. 2031a.

The terms of the annuity provided that Equitable should pay Mrs. Gravis $142.25 monthly for the remainder of her life, commencing April 20, 1946; provisions thereof regarding payments to be made after the death of Mrs. Gravis read as follows:

"Refund. If, upon the death of the Annuitant while this contract is in force, the sum of the Annuity payments which have become due under this contract is less than the consideration, the Society will continue the payment of the Annuity, as each payment becomes due, to the beneficiary as hereinafter designated until the total amount of the Annuity payments made by the Society equals the consideration, the final payment to be of an amount equal to the excess of the consideration over the total Annuity payments previously made by the Society, subject, however, to any provision for commutation in the provision hereof entitled 'Beneficiary.'

"Beneficiary

"1. Any Annuity payments which become due after the death of the Annuitant shall be paid to the Annuitant's brother, Rudolph A. Haberman, Jr., (herein called the beneficiary, with reservation of the right to change the beneficiary).

\* \* \* \* \*

"3. If the executors of the administrators of the Annuitant be not expressly designated as beneficiary, any unpaid Annuity payments, with respect to which there is no designated beneficiary living when such payments become due, shall be paid to the executors or administrators of the survivor of the Annuitant and beneficiary. Any Annuity payments becoming due to the executors or administrators of any person shall be commuted on the basis of $2\frac{1}{2}\%$ per annum compound interest and paid in a single sum to such executors or administrators."

While Haberman was originally designated as beneficiary, Mrs. Gravis later changed the beneficiary to her mother and father. However, Mrs. Gravis' mother and father were killed in an automobile accident several years prior to Mrs. Gravis' death, and there were no other designations of a beneficiary under the annuity contract.

The monthly payments of $142.25 were paid to Mrs. Gravis by Equitable from April 20, 1946 through November 20, 1949. On December 19, 1949, at the request of Mrs. Gravis, to enable her to pay certain tax deficiencies, the annuity was surrendered and rewritten so as to reduce the consideration stated from $50,000 to $43,827.77, and the monthly payments from $142.25 to $124.69; in exchange for which Equitable paid over to Mrs. Gravis and the Collector of Internal Revenue the sum of $4,001.15. All other terms of the rewritten annuity were the same as in the original, and there is no dispute here in connection with the fairness or propriety of that transaction. Equitable paid the reduced monthly installments to Mrs. Gravis from December 20, 1949, through Jan-

uary 20, 1953; it also paid her $918.18 in dividends on the annuity during her lifetime. Mrs. Gravis died February 15, 1953.

Since the total amount of monthly installments paid to Mrs. Gravis, $10,996.92, was substantially less than the consideration paid, additional payments were due under the "Refund" provisions of the annuity set out above.

Equitable interpreted these provisions as calling for the payment to Haberman as executor of Mrs. Gravis' estate, of the lump sum of $25,811.38, this being the commuted value, at 2½ compound interest, of the additional monthly installments which would have been required to make the total amount of monthly payments under the annuity equal the consideration.

Haberman, on the other hand, contended that Equitable was obligated to pay the estate $35,001.93, which is the difference between the original $50,000 consideration and the total amount, other than dividends, previously paid to Mrs. Gravis, namely $10,996.92 in monthly payments and $4,001.15 on the rewriting of the annuity. Equitable paid Haberman the $25,811.25 it admitted to be due, which payment was accepted by Haberman on July 17, 1953, "without prejudice" to the rights of the parties.

Haberman tendered to Equitable the annuity and the $918.18 paid as dividends under the annuity, demanded the additional sum of $9,190.55, and threatened suit if payment was not made. Equitable thereupon brought this declaratory judgment action to determine whether it was liable for the $9,190.55 or any part thereof, and for an injunction against further threats. Haberman counterclaimed for the $9,190.55 with interest.

The trial court granted Equitable's motion for summary judgment, and Haberman appealed, relying on three points:

(1) Haberman contends that the annuity is a "security" as defined in the Texas Securities Act, and that, since the provisions of the Texas Securities Act were not complied with in connection with the issuance and sale of the annuity, and the agent who sold the annuity was not a registered securities dealer or salesman, and Equitable was not a registered securities dealer, the annuity is voidable at Haberman's election, pursuant to § 33a of the Act. Equitable contends, on the other hand, that the annuity is not a "security" as that term is defined in the Texas Securities Act, and, therefore, that the provisions of that Act have no application to the annuity nor to the issuance and sale thereof.

(2) Haberman contends that under the terms of Art. 2031a, Texas Civil Statutes, Equitable was required to file with the Secretary of State of Texas a power of attorney designating some resident of Texas as its agent upon whom process might be served, and that having failed to file such designation with the Secretary of State, Equitable's acts in Texas, including the issuance and sale of the annuity, are either void or voidable. Equitable contends, on the other hand, that Art. 2031a has no application to a foreign life insurance company which has complied with all of the provisions of the Texas Insurance Code, including the obtaining of a Certificate of Authority issued by the Board of Insurance Commissioners of Texas authorizing it to transact a life insurance and annuity business in Texas and the appointment of the Chairman of the Board of Insurance Commissioners of Texas as the Company's agent for service of process.

(3) Haberman contends that the annuity is ambiguous, being susceptible of the interpretation that the amount payable to the estate of the annuitant upon her death was to be $35,001.93, and the ambiguity should be resolved against Equitable. Equitable contends that the annuity is unambiguous and can mean only that upon annuitant's death with no beneficiary surviving her, it was obliged to pay her estate a lump sum represent-

ing the commuted or discounted value, at 2½% per annum compound interest, of the additional monthly installments which would have been required to make the total amount of all monthly payments under the annuity equal to the consideration, this sum being $25,811.33.

We shall consider these points in the order named.

(1) The Texas Securities Act, Art. 600a, Texas Civil Statutes, defines a security as follows:

> "Sec. 2(a) The term 'security' or 'securities' shall include any share, stock, treasury stock, stock certificate under a voting trust agreement, collateral trust certificate, equipment trust certificate, pre-organization certificate or receipt, subscription or reorganization certificate, note, bond, debenture, mortgage certificate or other evidence of indebtedness, any form of commercial paper, certificate in or under a profit sharing or participation agreement, certificate or any instrument representing any interest in or under an oil, gas or mining lease, fee or title, or any certificate or instrument representing or secured by an interest in any or all of the capital, property, assets, profits or earnings of any company, investment contract, or any other instrument commonly known as a security, whether similar to those herein referred to or not."

■ Appellant contends that this definition embraces the annuity policy involved here. Appellee does not claim any of the eighteen specific statutory exemptions carved out of the defined category, but contends as a matter of law on the agreed facts, that the policy is not within the limits of the definition. We agree that this is a question of law and that § 4 of Art. 600a, placing the burden of proof of any specific exemption on the party claiming it, has no application here as appellant would have us believe.

■ Although the definition quoted above is not as precise as might be desired in reference to the specific question confronting us, we are convinced that such annuities are not securities subject to the provisions of Art. 600a. Appellant relies entirely on the general words "other evidence of indebtedness," "investment contract," and "any other instrument commonly known as a security, whether similar to those herein referred to or not." But we do not interpret these words as including the annuity involved here. The words "or other evidence of indebtedness" must be construed according to the rule of *ejusdem generis*. 50 Am. Jur., "Statutes" § 249. Certainly, even assuming that an annuity is an evidence of indebtedness—a questionable assumption in view of the aleatory and contingent nature of the amount ultimately to be paid—it is not of the same sort as a note, bond, debenture, or mortgage certificate. Hence, it is not comprehended by these general words.

■■ The rule of construction that the meaning of statutory words is to be determined by their context, or *noscitur a sociis*, should be applied in determining the meaning of "investment contract" in the Texas Act. These words having no fixed technical significance, their meaning must be ascertained from the specific terms in connection with which they are used; that is, they should be interpreted as referring to instruments of the same general type as the specifically enumerated ones. It seems certain to us that the Legislature meant by this language to give color and scope to the specific terms, and to fill in any interstitial loopholes in the area staked out, so to speak, by the specific terms; not to extend that area radically so as to include quite dissimilar things which have precise and well known names, which the Legislature could easily have included expressly had it wished to do so. Certainly annuities issued by regulated insurance companies are not at all similar to the securities specifically enumer-

ated in the statute. In fact, we would not regard "investment contract" as a correct description of an annuity. While annuities are sometimes called investments, that is not an apt characterization. Indeed, it is not unusual to hear a person say he is investing in a new suit or a new car, but the essence of such transactions is really quite different. An annuity is also quite different; what makes it essentially an annuity is that it is a form of risk-sharing. In life insurance, the risk from which protection is usually sought is that the insured may die young without provision for his dependents; in an annuity, the risk is that the annuitant may live long, outliving his means for his own support. To the extent that insurance or annuities are risk-sharing, they are certainly not investments. It is true that investment or other objectives can be combined in such plans, but they are not of their essence. Besides, we perceive a striking difference between the instruments specifically included in the definition, on the one hand, and insurance and annuity policies of regulated companies, on the other; the latter are governed by a special statutory scheme, and reserves are required by law to be maintained for them. Thus we think the general words "investment contract" cannot be reasonably interpreted as including something so dissimilar to the specifically named instruments, as the annuity in this case. Whether they might include an annuity issued by one not a regulated insurance company, we need not decide.

As for the words, "any other instrument commonly known as a security," we do not recall a single instance in which we have heard an annuity called a security either by the learned or the vulgar. The diligent search of appellant's counsel has not disclosed to us a single instance; several authorities are cited which call an annuity an "investment," but that is quite another matter. We cannot therefore reasonably construe these words as including the annuity in question.

Appellant argues further that since the Texas Act does not specifically exempt such annuities although the Federal Securities Act does,[1] the Texas definition of security, modelled after the Federal one, must include annuities. But we agree with appellee that the Report of the House Committee on the Federal Securities Act destroys this argument, based as it is on legislative intent:

"The above exemption [set forth in footnote 1] makes clear what is already implied in the Act, namely, that insurance policies are not to be regarded as securities subject to the provisions of the Act. The insurance policy and like contracts are not regarded in the commercial world as securities offered to the public for investment purposes. The entire tenor of the Act would lead, even without this specific exemption, to the exclusion of insurance policies from the provisions of the Act, but the specific exemption is included to make misinterpretation impossible. House Committee Report, No. 85, 73rd Congress, First Session, p. 15." 1 CCH Federal Security Law Service ¶2231.

The case of Hamilton v. Penn. Mutual Life Ins. Co., 196 Miss. 345, 17 So.2d 278, squarely supports our holding herein. See also Rinn v. New York Life Ins. Co., 7 Cir., 89 F.2d 924; Bates v. Equitable Life Assurance Society, 206 Minn. 482, 288 N.W. 834; Annotation, 163 A.L.R. 1050.

(2) Appellant's second argument is based on Vernon's Ann. Texas Civil

1. 15 U.S.C.A. § 77c(a) (8) exempts from the Federal Securities Act—

"Any insurance or endowment policy or annuity contract or optional annuity contract, issued by a corporation subject to the supervision of the insurance com-missioner, bank commissioner, or any agency or officer performing like functions, of any State or Territory of the United States or the District of Columbia."

Statutes, Art. 2031a which provides in pertinent part:

"Art. 2031a. Power of attorney designating resident for service of process; penalty for failure to file

"Section 1. No foreign corporation shall transact or do any business in this State without first having filed in the office of the Secretary of State a power of attorney designating some individual who is a resident citizen of this State, as its service agent, upon whom process may be served in all suits, proceedings and causes of action, pending or hereafter filed in this State, in which said foreign corporation is a party or is to be made a party.

\*　　\*　　\*　　\*　　\*

"Sec. 5. If any corporation which is required by the terms of this Act to file the power of attorney and designate a service agent and to keep and maintain such agent or his successor within this State at the address designated in such power of attorney as provided by this Act, shall fail to do so, then and in such event:

"(a) Each of its acts in this State shall, as to it, be unlawful and void and none of such acts shall, as to it, be valid; and it shall be incapable in this State of receiving the benefit of exercising in its behalf or enjoying any right, power, privilege or immunity that shall not already have accrued, provided that none of its acts done subsequently to the filing of such a power of attorney, though such filing be late, shall be affected by the foregoing provisions, nor in case of such late filing shall the incapacity affected by the foregoing provisions apply to any right, power, privilege or immunity that shall have wholly arisen and accrued after such filing.

"(b) Such corporation shall be incapacitated to maintain any suit or legal proceedings in any Court in this State upon any demand whether arising out of contract or tort."

Appellant contends that this statute makes the annuity void as to Equitable and that he is entitled thereby to rescind the annuity and recover the consideration paid, upon restoration to Equitable of the payments and dividends already received by him or his testatrix. Equitable replies to this that other Texas statutes show that foreign insurance companies are to be governed only by the Texas Insurance Code, and that Art. 2031a does not apply to Equitable, even though on its face it applies to all foreign corporations doing business within the state. Texas Insurance Code, Arts. 21.42, 21.43; Vernon's Ann.Texas Civil Statutes, Art. 1538.

We do not need to decide whether those statutes have the effect claimed by Equitable. We think that whether or not § 2031a applies to foreign insurance companies, under the circumstances of this case Haberman is not entitled to restitution. We shall assume, without deciding, that Equitable's failure to comply with § 2031a made the annuity "void" in the sense of the statute. Such a "void" contract is not, however, altogether without legal effect. The other party may recover on a contract made in violation of § 2031a. Hayden v. Dallas County, Tex.Civ.App., 143 S.W.2d 990; 6 Williston, Contracts (Rev.Ed.) § 1773. And furthermore,

"In the absence of constitutional or statutory provisions expressly providing otherwise, the rule is quite general that while a contract entered into by a foreign corporation which has not complied with the conditions of doing business in the state would be void or voidable while still executory, and so not enforceable by the corporation, the contract, after it has been fully executed, is to be treated as a valid contract, and the corporation may maintain or defend its rights arising under the contract." 23 Am.

Jur., "Foreign Corporations," 1954 Pocket Supp., § 356.

See also Annotation, 7 A.L.R.2d 256, where more than a score of cases supporting this view are collected. Only one case there appears really contrary. Flinn v. Gillen, 320 Mo. 1047, 10 S.W. 2d 923. The case of Edward v. Ioor, 205 Mich. 617, 172 N.W. 620, 15 A.L.R. 256, involved the Blue Sky Law, which obviously is based on different policy considerations, from the statutes requiring licensing or designation of service agents by foreign corporations in general, and that case may be regarded as distinguishable from the present one on this point. See Gill v. S. H. B. Corp., 322 Mich. 700, 34 N.W.2d 526, 7 A.L.R. 2d 252. There do not seem to be any Texas cases in point, but we believe that Texas would follow the majority view.

Now, the contract should not be regarded as fully performed on the part of Equitable in this case; Equitable paid the monthly installments to Mrs. Gravis during her lifetime and provided her with the assurance of an undiminished income during her lifetime, which was a primary object of the annuity; and upon her death tendered what we are convinced was the full amount due to Haberman as her executor, according to the terms of the annuity; and finally, paid that amount to Haberman "without prejudice" to the rights of the parties. But for this reservation of rights by Haberman, we think the contract would now be fully performed by its terms. But regardless of this reservation of rights, there was a substantial part performance and a tender of full performance: Should we not regard this tender as having the same effect as full performance in cutting off the power of rescission? The object of the statute being to protect citizens of Texas from imposition by foreign corporations, is not this object fulfilled by a tender of full performance, the tender being kept good, just as it is by actual full performance?

We think that it is. A valid tender of certain types of obligation discharges them. 6 Williston § 1809. In the case of an obligation to pay money, as in the present case, a tender does not discharge the debt, but it has practically all other effects as would payment. It discharges the security for the debt and cuts off interest and the right to costs from the date of tender. Thus in many ways the obligation is treated as if it were performed. 6 Williston § 1817. This is not unreasonable, since a tender would amount, by definition, to complete performance if it were accepted. Only the obligee, not the obligor, is to blame that the obligation is not then fully performed. Thus, we think it is quite proper for us to hold that the tender of full performance cut off Haberman's assumed right to rescind the annuity, though we have found no cases from Texas, nor indeed from other jurisdictions, precisely in point.[2]

We think this rule is especially reasonable with respect to aleatory contracts, as annuity contracts. Here, the annuitant sought protection from the risk that she might not have the means to support herself in her old age. She obtained that protection at a time when its value was fortuitous and actuarial. In fact, she lived less than eight years after the issuance of the annuity, but the average life expectancy at her age was actually thirty or forty years. Had she lived a normal life span, she would have received more than the consideration paid, and her beneficiary or estate would be entitled to nothing. The protection from risk would therefore seem to be the principal benefit sought by the annuitant. Since she received that protection fully it seems right to regard the insurance company's obligation as so substantially executed, that her executor has no power of rescission. An analogous case may make this clearer: Suppose a foreign corporation not fully qualified to do business in Texas insures its $50,000

2. Cf. the authority that substantial performance may excuse a condition requiring full performance. 3 Williston § 842.

building there for a $100 premium. The building is destroyed by fire. Would it not be reasonable to make a distinction between the insurer's right to rescind before and after the loss? See Restatement, Contracts § 293; 3 Williston § 889. When, coupled with this circumstance that the fortuitous event has happened, there is both substantial performance and tender of full performance, as in the present case, we think the Texas courts would treat the contract as valid in spite of Art. 2031a.

What we have said on this point may be expressed also in terms of a more general legal principle. It is clear that any right of Haberman to recover must rest on an action for money had and received, an action based on a rescission, or an action for a rescission and an accounting. All of these are forms of action to which the rule stated in Restatement, Restitution § 142, is applicable:

"§ 142. Change of Circumstances.

"(1) The right of a person to restitution from another because of a benefit received is terminated or diminished if, after the receipt of the benefit, circumstances have so changed that it would be inequitable to require the other to make full restitution. * * *"

We think that such a change of circumstances is clearly present in the present case, which terminated completely the right to restitution. See also Restatement, Contracts §§ 486, 600, 601.

■■ Although he has not thus far raised the issue, appellant may object that, granted our assumption that Art. 2031a applies to a foreign insurance company, the court has no jurisdiction of the action because § 5(b) of that Article incapacitates Equitable from bringing any action. However, this objection has no merit even under the assumption made. Such a statute disabling a foreign corporation from bringing an action does not disable it from defending an action, Home Forum Ben. Order v. Jones, 20 Tex.Civ.App. 68, 48 S.W. 219; 23

Am.Jur. "Foreign Corporations" § 335; Annotation, 17 L.R.A.,N.S., 1117; consequently Equitable could defend the counterclaim in the present action. That counterclaim was a compulsory counterclaim under Rule 13(a), Federal Rules of Civil Procedure, and even if the complaint be dismissed, a compulsory counterclaim is not required to be dismissed where it is supported by a proper ground of federal jurisdiction. Pioche Mines Consol., Inc., v. Fidelity-Philadelphia Trust Co., 9 Cir., 206 F.2d 336, certiorari denied 346 U.S. 899, 74 S. Ct. 225, 98 L.Ed. 400; Isenberg v. Biddle, 75 U.S.App.D.C. 100, 125 F.2d 741; 3 Moore's Federal Practice § 13.15. Here, federal jurisdiction of the counterclaim is present because there was diversity of citizenship and the requisite amount in controversy. Consequently, whether or not Equitable had the capacity to bring this action, this court has and the court below had, jurisdiction, Haberman having allowed the action and counterclaim to go to final judgment on the merits.

■ (3) Haberman's final argument is that the annuity is ambiguous and that the ambiguity should be resolved against Equitable so as to give him the $9,190.55 he claims. The text of the annuity is quite clear and susceptible to no other interpretation than that claimed by Equitable. Haberman urges that the caption on the title page, "Refund Annuity," "With continuation of payments until consideration has been returned," and the same words at the bottom of page one of the annuity, conflict with the words on page two on which Equitable relies:

"Any annuity payments becoming due to the executors or administrators of any person shall be commuted on the basis of $2\frac{1}{2}\%$ per annum compound interest and paid in a single sum to such executors or administrators."

We cannot agree with Haberman's contention. Taking the contract as a whole, no reasonable person could con-

clude that it meant anything other than what Equitable contends it means. Certainly there is nothing to support Haberman's claimed interpretation. The words "with continuation of payments until consideration has been returned" standing by themselves might indicate that periodic payments were to be continued after the annuitant's death, but not that her executor should be entitled to an accelerated lump sum payment of remaining future payments. This leaves the caption of the instrument "Refund Annuity" to support Haberman's interpretation. These words do not express any intention inconsistent with the text of the policy. On the contrary, the text makes it very clear in what sense the annuity was a refund annuity; the consideration was to be refunded in periodic payments to the annuitant, or if she died before the entire amount was repaid, then to the named beneficiary. If there was no surviving named beneficiary, then the discounted present value of the remaining installments was to be paid to her estate. By Haberman's interpretation, the annuitant's estate would receive a windfall in the form of immediate repayment of the consideration not yet refunded, instead of future payments or their immediate discounted value. Surely there is no indication that the parties intended such a windfall to occur. Thus, this contention is likewise without merit.

A final observation concerning Haberman's claimed right to restitution; the agreed statement of facts shows that Mrs. Gravis did not pay the consideration for the annuity, but that Mr. Gravis (presumably her husband) did. There is nothing in the record to show how Haberman might have any claim to Mr. Gravis' rights to restitution of the consideration paid, and it would seem that he, his heirs, legatees, or assigns might have a better right than Mrs. Gravis' estate, if any such right existed.

The court below did not err, and its judgment is

Affirmed.