Joe B. HUNT, Insurance Commissioner of the State of Oklahoma, Plaintiff in Error,

v.

The EQUITABLE LIFE ASSURANCE SOCIETY OF The UNITED STATES, a corporation, Defendant in Error.

No. 39623.

Supreme Court of Oklahoma.

Nov. 24, 1964.

Rehearing Denied Feb. 23, 1965.

Charles R. Nesbitt, Atty. Gen., and Fred Hansen, Asst. Atty. Gen., Robert D. Allen, Deputy Insurance Commissioner and Counsel, Wm. G. Fisher, Assistant Insurance Commissioner and Counsel, for plaintiff in error.

V. P. Crowe, Ben L. Burdick, Robert W. Pittman, Crowe, Boxley, Dunlevy, Thweatt, Swinford & Johnson, Oklahoma City, for defendant in error.

WILLIAMS, Justice.

By this appeal there is presented a controversy as to the extent of the liability of defendant in error insurance company, hereinafter referred to as Equitable, to the State of Oklahoma for certain taxes for the years 1954 through 1958. During such years numerous residents of Oklahoma paid to Equitable varying amounts on life annuity contracts. Determinative of the controversy is whether or not the respective considerations paid for such contracts are "premiums * * * from insurance of every kind upon persons or on the lives of persons resident in this state * * * or upon any other risks insured within this state * * *"

Equitable is an insurance company chartered to do business under the laws of the State of New York. It has engaged in the transaction of insurance business in the State of Oklahoma since 1908, operating under licenses annually granted to it by the respective Insurance Commissioners of the State of Oklahoma. During the years from 1954 through 1958, both inclusive, Equitable received more than $33,000,000.00 ir life annuity premiums, while receiving only some $30,000,000.00, in insurance premiums for all other business done in Oklahoma, during such years.

Prior to Equitable's request for license for the period commencing March 1st, 1959, the successive Commissioners had held, pursuant to the various statutes involved and their respective interpretations thereof, that a certain license tax hereinafter discussed which was applicable to insurance premiums in general did not apply and was not required to be paid upon life annuity premiums.

However, when Equitable submitted its annual report and check for fees and taxes due the State of Oklahoma on all other insurance premiums than those for life

annuities collected in 1958 and requested such new license for 1959, the present Insurance Commissioner of the State of Oklahoma, hereinafter referred to as Commissioner, accepted Equitable's check and prepared its license for issuance but refused to deliver same to Equitable. The Commissioner advised Equitable that in addition to other fees and taxes due by it, it should pay a four per cent premium tax upon life annuity premiums received by it for the years 1954 through 1958, both inclusive, failing which its then current license would be revoked. Equitable refused.

On November 6, 1959, after a hearing before the Commissioner an order was issued by him directing Equitable to pay $1,243,148.08 in additional premium taxes for the years 1954 to 1958 inclusive, that is, for such taxes upon life annuity premiums received by Equitable during such years.

Equitable appealed to the district court where upon trial de novo the order of the Commissioner was reversed. The district court held that Equitable's selling of life annuity contracts did not constitute the doing of business of the character of "insurance" under the applicable laws of 1951, or under the Oklahoma Insurance Code of 1957, and that Equitable had no tax liability to the State of Oklahoma for the years through 1958 for premium taxes on the income it realized from sale of its life annuity contracts. The Commissioner brings this appeal to review the judgment of the district court.

For each of the four years 1954 through 1957, both inclusive, Equitable had reported to the Commissioner its gross premiums on insurance exclusive of those received from sale of life annuities and the Commissioner had issued it a license for the ensuing year. Such license stated that Equitable had complied with those requirements of the insurance laws of Oklahoma that were applicable.

Annually since 1908, Equitable has applied for issuance of an annual renewal license granting it authority to exercise the privilege of transacting specific kinds or classes of insurance business in Oklahoma. For each of such years Equitable's "Agreement and Application" requesting authority to transact specific kinds of insurance business in Oklahoma has included a "Certificate of Compliance" executed by the Superintendent of Insurance of the State of New York, setting forth the kinds of business it was qualified to transact in that state. The New York Certificates of Compliance filed for the years 1954 through 1958 granted Equitable authority to transact the business of "Life, Annuities, Health and Accident Insurance". The agreement and application forms filed for the years 1954 through 1957 requested authority to transact "Life, Accident and Health Insurance on Group Plan only and Purchase and Sale of Annuities." Such form for 1958 requested authority to transact "Life, Accident and Health Insurance." The licenses issued to Equitable for the years 1954 through 1958, both inclusive, respectively granted it authority to transact only the business of "life, accident and health insurance". Under such licenses Equitable has at all times transacted the business of selling annuity contracts within the State of Oklahoma. Equitable was not required to secure any other license than that issued to life insurance companies generally in order to be authorized to sell annuities in this State. Its agents selling annuities are licensed as life insurance agents only.

■ Equitable contends that the Commissioner lacks power to refuse to renew its license for 1959 because of the nonpayment of additional taxes for the years 1954, 1955, 1956 and 1957. Without deciding whether or not Equitable has paid all taxes due from it for such years, for the reasons hereinafter set forth, we now determine that the Commissioner may not now require Equitable to pay taxes on premiums received from life annuity contracts for the years 1954, 1955, and 1956 and the first six months of 1957.

In the 1909 General Insurance Act there was enacted a section (Session Laws 1909, Ch. 21, Art. 1, sec. 73, being 36 O.S.1951 § 18) which reads as follows:

"This article shall not apply to annuities, industrial policies, nor to associations operating on the fraternal plan, nor to farm mutual companies; nor shall Sections 3406, 3470, 3471, and 3473, apply to foreign companies or associations operating upon the assessment plan."

As noted, the above exemption was in Sec. 73 of Art. 1 of the 1909 Act. The provision of such Act levying a premium tax was in Sec. 22 of Art. 1 thereof. Later the premium tax statute became 36 O.S.1941 Sec. 104, and the exemption section became 36 O.S.1941 Sec. 18. These were carried forward in Oklahoma Statutes 1951 as same sections of same title. Such new designation had no effect on the exemption.

By the very act of excepting annuities and certain other classes of insurance from the operation of sundry provisions of the insurance article the Legislature would appear to have intended that such annuities would be considered within the definition and included within the term "insurance" unless specifically excluded.

Section 5301 of the 1957 Oklahoma Insurance Code, effective July 1, 1957, expressly repealed such section 18, supra.

We therefore conclude that prior to the enactment of the 1957 Oklahoma Insurance Code, which, as has just been noted, expressly repealed such exemption, annuity premiums were not subject to taxation.

We now consider Equitable's tax liability from July 1, 1957, to January 1, 1959.

The title of the 1957 Insurance Code, inter alia, is as follows:

"An Act relating to insurance; * * to provide for the imposition of taxes and fees on the business of foreign and alien companies and associations and providing for the disposition thereof; * * *."

36 O.S.1957 Supp. § 102 provides:

"'Insurance' is a contract whereby one undertakes to indemnify another or to pay a specified amount upon determinable contingencies."

Section 624 of Title 36, O.S.1957 Supp., is the insurance premium tax statute of the Insurance Code of 1957. In pertinent part it provides:

"Every foreign and alien insurance company * * * doing business in the State of Oklahoma in the execution or exchange of contracts of insurance or indemnity, or as an insurance company of any nature or character whatsoever * * * * shall, annually * * report * * * to the Insurance Commissioner, the total amount of premiums, membership, application, policy and/or registration fees received during the preceding calendar year * * * from insurance of every kind upon persons or on the lives of persons resident in this state * * * and/or upon any other risks insured within this state, and shall * * * pay to the Insurance Commissioner:"

\* \* \* \* \* \*

"(2) An annual tax of four per cent (4%) on all of said direct premiums * * *. Such * * * tax * * * shall be in lieu of all other state taxes or fees * * * except ad valorem taxes. * * *"

In 51 Am.Jur., Taxation § 927, p. 817, is the following language:

"* * * (I)t has been held, in particular instances, that * * * the consideration paid for an annuity contract may be considered as constituting 'premiums' within the meaning of such enactments. With respect to the latter type of insurance receipts, there is a difference of judicial opinion on the question, some cases taking the position that such payments constitute premiums within the meaning of tax statutes, and some that they do not. Although there have been attempts to distinguish some of the conflicting de-

cisions on this question on the basis of statutory differences, the existence of a genuine conflict of authority must apparently be recognized. Some of the cases have turned on the ground that annuity contracts are insurance, so that the consideration paid for them is taxable as premiums paid for insurance, but the view has also been expressed that even assuming that annuity contracts do not represent insurance, the legislature may still have intended to subject the payments made for them to taxation as 'premiums' * * * "

It would appear that the Legislature by specifically providing in section 624, supra, that every foreign insurance company shall, annually, report the total amount of premiums, etc., received during the preceding calendar year, or since the last return of such premiums, etc. was made by such company, "from insurance of every kind upon persons or on the lives of persons resident in this state * * *, and/or upon any other risks insured within this state, and shall, at the same time, pay to the Insurance Commissioner: * * * " the required premium taxes, intended the words "insurance of every kind" and "any other risks insured" to definitely include "annuities".

For the year 1958, the premiums for annuities paid to Equitable in Oklahoma approximately equaled all other insurance premiums received by it.

68 O.S.1951 § 912, a portion of our income tax statutes, in pertinent part, provides:

"(b) Insurance companies paying, during the taxable year, a tax to this State on gross premium income shall be exempt from the provisions of this [Income Tax] Act and the taxes imposed thereby."

Such section 624, supra, provides that the payment of such tax shall be in lieu of all other State taxes and fees except ad valorem taxes. Evidently the Legislature when it enacted this exemption considered premiums on annuities as being taxable under the statutory provisions relating to tax on premiums or it would have qualified such exemption by requiring foreign life insurance companies to pay state income taxes on premiums received in this State on their life annuity business. From this circumstance and the additional fact that the State Tax Commission does not require Equitable to pay Oklahoma income taxes on income received from its life annuity business, it would seem that the said 4% tax was intended to be levied on premiums received by a company such as Equitable from all its Oklahoma insurance business including the sale of life annuities. Otherwise, as in the case of Equitable, the greater portion of a foreign insurance company's insurance business in Oklahoma might be in the life annuity category and the company would not pay this State either said 4% premium tax or any income tax on its receipts from the sale of life annuities.

In the case of Mutual Benefit Life Ins. Co. v. Commonwealth, 227 Mass. 63, 116 N. E. 469, 470, the Massachusetts Court construed a statute which levied a tax on all policies issued or assumed by life insurance companies which are held by residents of that state. In Oklahoma the tax is levied on all premiums received on insurance and "other risks", etc. (See statute, supra). In that case that court said:

"The respondent concedes on the authority of Curtis v. New York Life Ins. Co., 217 Mass. 47, 104 N.E. 553, Ann.Cas.1915C, 945, that a contract for an annuity is not strictly a contract of life insurance as defined in R.L. c. 118, § 3. But the recodifying St. of 1907, c. 576, § 66 without expressly discarding the definition, provides that:

" 'All corporations, associations, partnerships or individuals doing business in this commonwealth under any charter, compact, agreement or statute of this or any other state, involving the payment of money or other thing of value to families or representatives of policy and certificate holders or members, conditioned upon the continuance or cessation of human life, or in-

volving an insurance guaranty, contract or pledge for the payment of endowments or annuities, shall be deemed to be life insurance companies. * * *'

"And the conclusion is irresistible that if the petitioner had issued only contracts for the payment of annuities, it must be deemed to be a life insurance company. If so it would be accurately described as in 'the business of life insurance.' It is none the less so engaged because it also issues policies of life insurance. The words 'the business of life insurance,' 'all policies in force,' 'total number of policies in force,' 'ordinary business,' 'each policy of ordinary business,' and 'the amount insured and the net value' found in section 26, as amended, are consequently to be read in connection with the spirit and purpose of section 66 of the St. of 1907, c. 576. While language more technically appropriate might have been used, the business of issuing contracts for annuities is under the statute 'the business of life insurance,' and if the word 'policy' ordinarily imports that at death a certain sum will be payable by the insurer, yet a 'policy' is a contract, and 'each policy of ordinary business' where the insurer engages solely in providing such security would cover the business of issuing contracts of annuity. By the statute this class of contracts is also put in the category of endowment contracts where a certain sum is to be paid the insured if he lives for a definite period, or if he dies before the period ends, payment is to be made to his heirs or to the designated beneficiary, which were held in Curtis v. New York Life Ins. Co., supra, as not being contracts of insurance as defined in R.L. c. 118, § 3. The statute also would include a contract of term insurance where the life is insured only for a term of years, or until the assured shall arrive at a certain age.

* * * * * *

"The St. of 1915, c. 217, § 1, was enacted after the decision in Curtis v. New York Life Ins. Co., supra, where it was further said when speaking of the different forms which the business of life insurance has assumed in recent years, 'one of the well known forms of contract is that of annuities,—not within the technical meaning of the term, or incorporeal hereditaments created by grant, but in the modern sense of a simple promise to pay a certain amount yearly.' We are accordingly of opinion that by the words 'all policies in force on the thirty-first day of December of the year preceding that in which the tax is payable,' the Legislature intended to include all contracts of every description issued by life insurance companies doing business in this commonwealth which are based upon the 'continuance or cessation of human life.' "

The section 66 quoted by the Massachusetts Court contains the same language as 36 O.S. 1951 § 181.

In the case of State ex rel. Holt, Attorney General v. New York Life Ins. Co., 198 Ark. 820, 131 S.W.2d 639, 640, 641, the court said:

"These two cases are reviewed at length by the Supreme Court of Iowa in the case of Northwestern Mutual Life Ins. Co. v. Murphy, Commissioner, 223 Iowa 333, 271 N.W. 899, 109 A.L.R. 1054, in which a statute similar to our own was construed. In an opinion, which was unanimous, the Supreme Court of Iowa declined to follow the New York and Pennsylvania cases, and held (to quote a headnote): '1. The consideration received by an insurance company for 'its undertakings to pay annuities is properly included in the amount upon which the company is liable to a tax imposed by a statute requiring every foreign insurance company to pay annually into the state treasury as taxes a stated per-

centage "of the gross amount of premiums received by it for business done in this State, including all insurance upon property situated in this State and upon the lives of persons resident in this State during the preceding year." '

" * * * Expert witnesses called by the insurance companies differentiated annuity and other insurance, but the fact remains, in our opinion, that it is insurance, and that money paid for annuity insurance must be regarded as premiums paid for insurance.

"We are much persuaded in reaching this conclusion by the extensive discussion of the subject by Professor Huebner, Professor of Insurance and Commerce in Wharton School of Finance and Commerce, University of Pennsylvania, and President of the American College of Life Underwriters, in his textbook on Life Insurance. He devotes an entire chapter to the subject of Annuities, and differentiates the various types of annuities. We accept the view of Professor Huebner, rather than that of judges, who, like ourselves, have only occasional contacts with the subject. He says, at page 154 of the chapter on Annuities (3rd Ed.): 'Many believe that the growth of the annuity business will be the outstanding feature in the life-insurance business during the next quarter of a century. * * * The purpose of the annuity, it is seen, is to protect against a hazard—the outliving of one's income—which is just the opposite of that confronting a person who desires life insurance as protection against the loss of income through premature death. Technically, however, the two types of contracts are closely related to each other, since the cost of both is computed on the basis of similar data and principles. Sight should not be lost of the fact that annuities are simply another important means of insurance.'

"We conclude therefore, that sums of money paid for annuity insurance, which all the witnesses refer to as premiums, are taxable under the statute hereinabove quoted."

There were introduced in evidence in the trial in the lower court some seventy different annuity contracts or policies offered for sale to the public by Equitable at times pertinent in this case. All such annuity policies in evidence, with the exception of six which provide for a single payment and two group annuity policies, provide for the payments of "premiums".

In Northwestern Mutual Life Insurance Co. v. Murphy, 223 Iowa 333, 271 N.W. 899, 109 A.L.R. 1054, is the following applicable language:

" * * * The forms of the annuity contracts issued by plaintiff, the contracts that are the subject to this controversy, are in evidence. In all of these contracts is found the recital of the parties that 'in consideration of the payment of a single premium of (the agreed amount) the receipt of which is hereby acknowledged, the Northwestern Mutual Life Insurance Company promises to pay * * * a life annuity * * *' In argument plaintiff frankly admits that it does so use the word 'premium' in its annuity contracts. Plaintiff further concedes that 'most other companies' do likewise. From this record it is our opinion that in interpreting the words chosen by the Legislature for use in this statute, it would be hardly within reason to hold that there was an impossibility that the Legislature could adopt and intend to use the word 'premiums' in the same manner in which it was concededly and commonly used by the insurance companies themselves upon whom the tax is imposed. It might well be that in taxing insurance companies the Legislature sought to talk their language. To hold that the alleged definition is in fact exhaustive of the uses of the word 'premium' would be arbitrary and incon-

sistent with the facts in this case. We are unable to adopt plaintiff's premise that the word 'premium' is necessarily inapplicable to annuity contracts."

In State ex rel. Gully v. Mutual Life Insurance Company of New York, 189 Miss. 830, 196 So. 796, 799, 198 So. 763, the Mississippi Court said:

"The definition of annuity contracts in the agreed facts shows that they are conditioned on the cessation or continuance of human life. They are therefore life insurance contracts, notwithstanding no medical examination is required. None is required because it is to the interest of the insurer that the life of the insured shall be short instead of long."

Equitable's "Rate Manual" introduced into evidence by Commissioner dictates that the amount of premiums charged for an annuity policy in states which tax such premiums is the same as that charged for the same policy in states which do not levy a tax on the premiums.

The Supreme Court of Missouri in the case of State ex rel. Aetna Life Insurance Co. v. Lucas, Superintendent of Insurance, 348 Mo. 286, 153 S.W.2d 10, 12, said:

"The life insurance business is a matter of public concern. For that reason the section above set forth was enacted. The legislature knew that annuities were sold by life insurance companies. It knew that accident insurance and health insurance were sold by life insurance companies. It knew that annuities and accident and health insurance were not life insurance. For these reasons it separately authorized life insurance companies to engage in the business of selling annuities and in the business of selling accident and health insurance. It did so for the purpose of supervision, regulation and taxation. There could have been no other purpose. The section presents no ambiguity. In other words, the legislature classified annuities and accident and health insurance as life insurance,

solely for the purpose of supervision, regulation and taxation. If so, the money collected on an annuity policy sold in this state is a life insurance premium within the meaning of Sec. 5979, R.S.1929, Mo.St.Ann. § 5979, p. 4556, which follows: 'Every insurance company * * * not organized under the laws of this state, shall * * * annually pay tax upon the premiums received * * * in this state or on account of business done in this state, for insurance of life, property or interest in this state at a rate of two per cent. per annum in lieu of all other taxes * * * '."

"Relator contends that the agreement for an annuity is a contract and not a policy, and also contends that the money paid for an annuity is a consideration and not a premium.

"The contention must be overruled, for text-writers, insurance departments, those familiar with the insurance business, insurance men, including relator's agents, and the public have been, for many years, referring to annuity contracts as policies, and referring to the money paid for an annuity as a premium. Furthermore, relator states in advertisements that 'the annuity is one of the oldest forms of insurance'."

In the case of Haberman v. Equitable Life Assurance Society of the U. S., 5 Cir., 224 F.2d 401, 406, 408, the Court said:

"Appellant argues further that since the Texas Act does not specifically exempt such annuities although the Federal Securities Act does, the Texas definition of security, modelled after the Federal one, must include annuities. But we agree with appellee that the Report of the House Committee on the Federal Securities Act destroys this argument, based as it is on legislative intent: .

" 'The above exemption (set forth in footnote 1) makes clear what is already implied in the Act, namely, that insurance policies are not to be regard-

ed as securities subject to the provisions of the Act. The insurance policy and like contracts are not regarded in the commercial world as securities offered to the public for investment purposes. The entire tenor of the Act would lead, even without this specific exemption, to the exclusion of insurance policies from the provisions of the Act, but the specific exemption is included to make misinterpretation impossible.'

\* \* \* \* \* \*

"We think this rule is especially reasonable with respect to aleatory contracts, as annuity contracts. Here, the annuitant sought protection from the risk that she might not have the means to support herself in her old age. She obtained that protection at a time when its value was fortuitous and actuarial. In fact, she lived less than eight years after the issuance of the annuity, but the average life expectancy at her age was actually thirty or forty years. Had she lived a normal life span, she would have received more than the consideration paid, and her beneficiary or estate would be entitled to nothing. The protection from risk would therefore seem to be the principal benefit sought by the annuitant. Since she received that protection fully it seems right to regard the insurance company's obligation as so substantially executed, that her executor has no power of rescission."

In this connection we now quote some of the testimony given in the trial below.

Mr. Robert A. Long, a consulting actuary, and who was an actuary for two different insurance companies for a total of six and one-half years, testified:

"A: The manner of computing the risk? Well, if there is a risk to be computed, I would say it was an insurance contract."

Mr. William A. Poissant, chief actuary in the Department of Insurance in the Veterans Administration, (Washington, D. C.) testified.

"Q: Does an immediate life annuity with refund benefit involve any contingency?

"A: Yes.

"As soon as—after the guarantee period again, each payment is contingent upon the annuitant being alive on the due date to receive it."

\* \* \* \* \* \*

"Q: (By Mr. Allen) Is there an actuarial reason for the difference between the premium rates for an immediate life annuity issued on a male life and the same type of annuity issued on a female life?

"A: Yes, there is.

"The experience has shown that the mortality on women is lower than on men, or, conversely, their life expectancy is greater. Therefore, it is necessary to make a higher charge for annuities on women than it is on men.

"Q: Then, are the life contingencies which are involved in a life annuity issued to a male different than the life contingencies involved in a life annuity issued to a female?

"A: Yes. Quantitatively, they are different. The mortality level on women is different than it is on men.

"Q: Is that the reason that you would use a different mortality table in computing a premium for a male annuitant rate than a female annuitant rate?

"A: Yes."

"That is an annual premium retirement annuity. A very popular form.

"Q: What benefits are provided for by that policy?

"A: This provides an income at some normal retirement date, like 60 or 65.

"Once the annuity is entered upon, it continues for the lifetime of the annuitant, and the payments are guaranteed for a minimum of ten years.

"Now, there are options in there which permit the annuitant to elect a

reduced income at some earlier age than the normal date, or a larger income at some later age.

"The policy has death benefits cash values. The death benefit is generally—this one is as equal to the premiums paid or the cash value, whichever is greater.

"Q: Will the death benefit on that contract at any point exceed the premiums paid?

"A: Yes. The cash value in the later duration, I forget just where, but the cash value begins to climb over the total of the premiums paid.

"Q: Is there a contingency involved in that policy?

"A: Yes.

"There is a small death contingency in the early durations of the contract. And, then, later on, when the payments become contingent on the life surviving to receive it, you have a definite life contingency, yes.

"Q: Is there a risk assumed by the company when it issues this type of policy?

"A: The same type—yes. There is —there is three types of risks, I suppose, although in this type of contract, these are participating contracts, I would think that the risk was reduced to a minimum because any surplus that develops on these policies is absorbed through the medium of dividends.

"But there is a mortality and an interest and an expense risk in the sense that the actual experience may deviate from the assumed experience in the premium calculation."

Mr. Walter Klem, Equitable's senior vice president and chief actuary, testified:

"Q: Mr. Klem, that risk that you are speaking about is certainly contingent on the death of the individual annuitant, isn't it?

"A: The measure of the expense which we will pay out and not recover

by reason of this is a function of the number who die in the first year.

"THE COURT: It is contingent on it? That was all he asked you, contingent on the number who die?

"A: Yes, sir; that's true.

"Q. Now, Mr. Crowe asked you about permanent and total disability benefits. As a matter of fact, it has been stipulated that you pay premium tax on permanent and total disability benefits.

"Is it not also a fact that a total and permanent disability benefit involves an annuity?

"A: To be precise, we pay the tax on the premiums for total and permanent disability insurance.

"Now, the form of the disability insurance is sometimes to waive premiums, sometimes to pay a disability income to the disabled, say, annuitant or employee under group contract, and sometimes it is to do both. That is the form of the benefit that falls in the event of this contingency of a total and permanent disability.

"Q: Is not the disability income payment properly described as an annuity?

"A: It can be described as an annuity under disabled life, yes, sir.

"Q: That is what it is, isn't it?

"A: That is the form of the benefit, yes, sir.

"A: There is not, in a sense, any anticipated risk from the operation of mortality in conducting this annuity business. If our assumptions are born out, and if the deaths, in other words, occur in accordance with the table which we have adopted, then—and other elements of our basis of operation are met, and experience, then, you may say our business is riskless, but, because as in other business, there is some chance that we might make a mistake in judgment or pure error, or our experience in investments may not be in accord with the assumptions made,

there is a business risk that the corporation, the Equitable Society may lose money by operating in the annuity field. But, this is not the kind of a risk we speak of when we talk about insuring a risk.

"Q: Is that not precisely the same type of risk the Equitable runs with its ordinary life business?

"A: We run the same kind of business risks when we conduct a life insurance business in that the corporation, through a mistake in judgment, or error, or failure to achieve the expected results, may lose some money.

"But, there is another kind of risk. That is the risk which the individual has of loss of his insurable interest, which is what we are insuring when we talk about life insurance risk, and I don't want to confuse these two meanings of the word.

"Q: Does the company's obligation to one of these annuitants cease at the time that it has returned to him the monies he paid to it, plus whatever interest accumulations might have been made on that fund?

"A: No sir.

"Q: (By Mr. Allen) So, with respect to any given life which you have guaranteed to provide an income for, your company stands a definite mortality risk, does it not?

"A: I have to say that if you look at one life, there is the prospect that on that one life we will pay out more than we received by way of consideration and interest thereon. But, of course, we can't legally engage in doing an annuity business with one life.

"Q: Well, to avoid that risk, do you pool several annuitants' experience in order to obtain the operation of the law of averages and minimize that risk?

"A: We depend on the adherence of large numbers to this plan to have an average result, as assumed in the mortality table.

"Q: Is there any difference in the manner in which the principle of large numbers operates with respect to life annuitants than it does in the case or—than as in the case of the ordinary life policy holder?

"A: There is no difference in the broad general principle of the operation of these large numbers.

"Q: Is the company's obligation under an ordinary life contract and under a life annuity determined by one of the life contingencies?

"A: Life contingencies to me mean human events and includes death, disability and accident.

"Now, just as in a mortality table, the fundamental and basic table is the table of rates of mortality or rates of dying. Yet, it can't also be said that that fundamental table has much extension also to rates of survival. It is the counterpart of the fundamental basic contingency of death.

"If you ask if payment of an annuity is dependent on survival, of course, I say yes, but the basic contingencies with which we deal are death, disability and accident."

"A: The fundamental contingency that we are dealing with is the one of death. It has its conterpart that if you don't die you live, and, therefore, you will have the probability of living as well as the probability of dying."

"Q: Is each of the payments you are obligated to make under this life annuity policy contingent upon one thing and one thing alone?

"A: Yes. Each is dependent on the survival of the annuitant.

"Q: (By Mr. Allen) Is each payment dependent upon his survival?

"A: Yes, sir.

"Q: Is that just like a pure endowment benefit?

"A: I say you can call each of these payments, if you wish, a pure en-

dowment. Call it that if you wish. That is the definition of a pure endowment."

"Q: Now, if an individual annuitant would purchase an immediate life annuity and die before even one payment had been made, would the company's obligation under that contract cease?

"A: Yes, sir.

"Q: And he, the annuitant, would forfeit the monies he had paid to the company?

"A: That is your choice of words, but that is true. There would nothing more be payable."

"Q: (By Mr. Allen) Can you answer the question 'yes' or 'no' are there contingencies involved in each of these [annuity] contracts?

"A: There are not the basic contingencies that are referred to as life contingencies.

"Q: No—

"A: (continuing) But by association with death, contingency of death, you have to have what some people refer to as the contingency of living, but that becomes difficult for me, that is, the contingency of living.

"Q: Would you call that, as an actuary, the probability of survival?

"A: There is a probability of survival, yes, sir."

"Q: (By Mr. Allen) Mr. Klem, under any of these life annuity contracts, does not the annuitant stand to lose or gain by virtue of that contract, just as in the case of an ordinary life contract?

"A: It is not just as in the case of an ordinary life contract, no, sir.

"Q: Does he stand to lose or gain by virtue of certain life continguencies that are stipulated in those two types of contracts?

"A: Yes. There is a prospect of one individual gaining or losing on these two types."

No evidence of serious contradictory effect was introduced. A lot more of same effect as that above quoted was introduced.

Apparently annuities are considered generally as an insurance product and not as an investment. In our opinion life annuity policies are of a risk-shifting character and contingent on the duration of one's life, just as is the case with life insurance.

■ We regard an annuity as being included within the term "insurance" as set forth in 36 O.S.1957 Supp. § 102 where such latter term is defined as a contract "to pay a specified amount upon determinable contingencies". Such contingencies in the case of life annuities are that the policy-holders shall continue to live.

Section 624 of the Insurance Code, supra, does not specifically list disability annuities. Nevertheless Equitable seems to consider such to be insurance because it has paid taxes on such annuities. In a life annuity there is the contingency of the continuation of human life, and in a disability annuity there is involved the contingency of human disability. We fail to see such a distinction between the two as to make one taxable and the other not.

The chairman of the Legislative Council for the years 1955–1956 testified that the insurance committee of such council drafted the 1957 insurance code; that such committee, in its letter of transmittal submitting the proposed code to the executive committee of the Legislative Council, stated, "Definition of life insurance is broadened to include annuities".

In view of the above recited facts, i. e., the express repeal of 36 O.S.1951 § 18, the letter of transmittal of the proposed new insurance code to the Legislative council, the exemption from income tax of insurance companies paying taxes on gross premium income, the granting of an exemption on the "premium tax" on annuity contracts purchased by certain institutions,

and the fact that the Legislature, in session at the time Equitable and others were notified of taxes due, and other Legislatures subsequently in session, did not attempt to enact legislation exempting from the premium tax premiums received from annuity business, all indicate that it was and is the intent and desire of the Legislature of Oklahoma to levy a premium tax on premiums received by Equitable and others on their life annuity business in this State.

The only exemption from taxation of the premiums for life annuity policies now in effect we have found is in 11 O.S.1961 § 16. This section, inter alia, provides:

"*  *  *  (T)hat public and private educational institutions of the state not supported by any state appropriated funds may purchase annuity contracts for any of their full-time officers and employees  *  *  *  and no premium tax shall be due or payable on any such annuity contracts."

In view of the fact that the Legislature deemed it advisable to specifically exempt from taxation the annuity contracts of certain educational institutions, it would appear that the premium tax shall be due and payable on all other life annuity contracts sold in the State of Oklahoma, or otherwise there would be no necessity for this specific exemption.

Equitable contends that "The Insurance Commissioner lacks power to refuse to renew petitioner's [Equitable's] license for 1959 because of the nonpayment of additional taxes for the years 1954, 1955, 1956 and 1957, and his actions in attempting to collect taxes allegedly due for those years were unconstitutional". It argues that "There is no express authority in either the constitutional or statutory provisions for the commissioner to collect additional taxes for prior years".

Article XIX, Section 1 of the State Constitution provides:

"No foreign insurance company shall be granted a license or permitted to do business in this State until it shall have complied with the laws of the State, including the deposit of such collateral or indemnity for the protection of its patrons within this State as may be prescribed by law, and shall agree to pay all such taxes and fees as may at any time be imposed by law or act of the Legislature, on foreign insurance companies, and a refusal to pay such taxes or fees shall work a forfeiture of such license."

We consider the case of Travelers Insurance Company v. Fricke, Insurance Commissioner, 99 Wis. 367, 74 N.W. 372, 373, 374 and 375, 78 N.W. 407, 41 L.R.A. 557, applicable to the instant one.

In such case Travelers Insurance Company sought to enjoin the insurance commissioner of Wisconsin from revoking a license issued to it on March 1, 1896. The facts were that Travelers from the enactment of certain statutes in 1878 until the commencement of that action had done both a life and accident insurance business within Wisconsin under licenses issued annually by the various insurance commissioners; that during such time it paid, as a license fee for each year, the sum of $300.-00 up to the year 1895; that since that time it paid also 2% upon its gross accident business within that state; that in December 1896, the insurance commissioner demanded that it pay an additional $300.00 license fee for the transaction of its accident business for each year since 1880 and also the 2% tax for each such year with legal interest on such sums from the first of March in each year (the date of the issuance of the yearly license); and that the commissioner threatened to revoke the license issued to Travelers on March 1, 1896, in default of such payment. In its opinion that Court stated:

"*  *  *  In the present suit the question presented is whether the insurance commissioner has power to revoke the defendant's license for the current year, on account of its failure to pay the full license fees accruing for past years, during which it has

done business in this state under license. * * *

"* * * It is not, and cannot now be, denied that the plaintiff company could only transact business in this state by permission of the state, and under such conditions as the state might impose. * * * (W)e may at once proceed to consider what power of revocation the legislature has given to the commissioner of insurance. Section 1955, Rev.St., provides as follows: 'If any such corporation [referring to foreign insurance corporations] shall violate or fail to comply with any provision of law applicable thereto, or in case its capital shall be impaired and shall not be made good, within such time as the commissioner of insurance shall require according to section 1968, it shall be the imperative duty of said commissioner to revoke any and every authority, license or certificate granted to such corporation or any agent thereof to transact business in this state.' etc. It is argued that the power here granted to the commissioner is 'not a power of revision of the past, but of provision for the future'; that the language is prospective, and not retrospective; and that, for defaults occurring during the existence of previous annual license, there can be no revocation of an existing license the fees for which have been fully paid. Carried to its legitimate result, this argument would produce this result: that, when a license was once issued by the commissioner, all past matters, even in connection with the issuance of the license itself, would become a sealed book. It might have been obtained without compliance with the necessary provisions, and yet it could not be revoked, because the power of revocation is only given to be exercised upon violations occurring after the issuance of the license. * * * It is manifest, of course, that such could not have been the intent of the legislature; * * *. Is not this [failure to pay the lawful license fee] a continuing failure to comply with the law, and just as much a present failure as it was during the year when it occurred? Certainly, it was a legal duty then to pay the required fee. Did the duty cease at the end of the year? Has the lapse of time made it any the less a duty? Has the offense been condoned by the issuance of new licenses, decorated with gilt seals? So long as the fee remains unpaid, is it not a present failure to comply with the law, just as much as it was in the year when it occurred? We are unable by any chain of logical reasoning to say that this failure to comply with the law is a failure which is past and closed, and that it is not an existing failure as well. * * *

"It avails nothing to say that this license fee is essentially a tax, and that no action lies to recover a tax unless it be given by express statutory enactment. Concede for the moment that this be so, the failure to pay the lawful license was none the less a failure to comply with the provisions of the law when it occurred, and none the less a continuing failure up to the present time. Is it a hardship? No more a hardship now than it would have been if the annual amounts had been paid at the times required by the law. If a hardship at all, it is a hardship imposed by the law itself, and the legislature had full power to impose the hardship, if such in fact it be. * * *

"By accepting the license and doing business under it, the company undoubtedly bound itself to comply with the law governing the issuance of the license. * * * Nor, upon familiar principles, is the state estopped from now insisting upon the condition on account of the failure of its officers to require compliance with the law at the

proper time. * * * Nor does the statute of limitations apply, for two reasons: (1) The plaintiff was a foreign corporation all of the time, and had its residence in another state. Larson v. Aultman & Taylor Co., 86 Wis. 281, 56 N.W. 915. (2) This is not an action to collect the unpaid fees, but simply an action in equity, to prevent the commissioner from revoking the license. * * *"

In 51 Am.Jur., Taxation, § 927, p. 818 is the following language:

"It has been held that the license of a foreign insurance company for the current year may be revoked on account of its failure to pay the full license fees for past years during which it has done business within the state, for its failure to comply with the law is a present, existing failure."

We determine that the Commissioner was authorized to refuse to renew Equitable's license for 1959 for the reason Equitable had not paid all the taxes owed by it to the State of Oklahoma for the last half of 1957 and for all of 1958. The judgment of the trial court appears to be contrary to both the weight of the evidence and applicable rules of law.

In the foregoing opinion we have completely treated the essential issues as presented in the record herein of many hundreds of pages of testimony and exhibits and in the briefs of the parties containing many scores of pages of explanation, discussion and argument. Specific recitation and treatment of the varied propositions and counter-propositions is deemed to be unnecessary.

The judgment of the trial court is reversed with directions to proceed in a manner not inconsistent with the views herein expressed.

BLACKBIRD, C. J., and DAVISON, JOHNSON, JACKSON, IRWIN and BERRY, JJ., concur.

HALLEY, J., concurs in result.